**In the Matter of F/S COMPUTER CORPORATION, Debtor.**

**SALBER EQUIPMENT CORPORATION and Bersal Equipment Corp., Plaintiffs,**

v.

**F/S COMPUTER CORPORATION, Defendant.**

Bankruptcy No. 81–2858.
Adv. No. 83–612.

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 16, 1984.

M. Bruce McCullough, Pittsburgh, Pa., for debtor (defendant).

William J. Davis, Towanda, Pa., for Salber & Bersal (plaintiff).

Hillard Kreimer, Alan Z. Lefkowitz, Pittsburgh, Pa., for the Committee of Unsecured Creditors.

## MEMORANDUM OPINION

GERALD K. GIBSON, Bankruptcy Judge.

The matter presently before the Court is a petition for relief from the automatic stay, wherein petitioners seek payment of commissions earned as disclosed brokers in complex equipment leasing transactions from funds which are currently being held in escrow pursuant to pre-petition escrow agreements between the parties.

The parties have agreed that there is no factual dispute material to the legal question before the Court. Upon review of the various documents attached as exhibits to the petition for relief from the automatic stay, Counsel for the Debtor acknowledges that there is no dispute as to their authenticity or completeness.

The dispute at bar involves two complex transactions, the first of which is known as the F/S-Salber-Quiptape transaction, and the second of which is known as the F/S-Bersal-Billrich transaction.

The facts surrounding the F/S-Salber-Quiptape transaction are as follows. On October 23, 1981 F/S Computer Corporation, hereinafter "F/S" filed a petition under Chapter 11 of the Bankruptcy Code. Prior thereto on November 15, 1980 Salber Equipment Company, one of the petitioners herein, purchased from F/S certain IBM peripheral computer equipment which was owned by F/S and had been leased by F/S to the United States Trust Company. The purchase price consisted of a cash down-payment of $16,945.00; an interest pre-payment of $12,400.00; and delivery of Salber's promissory note in the face amount of $2,239,200.00 payable at the rate of $15,502.15 per month from November 30, 1980 through and including December 31, 1982; and $45,067.47 per month from January 31, 1983 through October 31, 1989. With respect to the promissory note, Salber was obligated to make mandatory interest pre-payments of $150,800 together with interest at 13% per annum (totalling $171,317.06) due on or before December 15, 1981; and $210,000 together with interest at 13% per annum (totalling $265,871.52) due on or before December 15, 1982. Both payments have been made to an escrow agent and are discussed in further detail *infra.*

As a second part of this transaction, Salber leased the equipment to F/S for a period of 108 months at a monthly rental equal to the aforementioned monthly note payments due from Salber to F/S.

On November 28, 1980 the last step in this equipment leasing transaction took

place. At that time, Salber sold the equipment to and leased it back from Quiptape Associates, a New York limited partnership for an aggregate purchase price to be paid by Quiptape of $2,261,800.00. This transaction occurred with the prior written consent of F/S. Quiptape paid to Salber a cash downpayment of $22,600.00 and an interest payment of $12,400.00; and delivered its limited recourse installment promissory note to Salber in the principal amount of $2,239,200.00, payable in monthly installments together with interest on the unpaid balance.

On November 30, 1981, Quiptape made a required interest pre-payment of $150,-800.00 together with interest at 11% per annum. On November 30, 1982 Quiptape made a further interest pre-payment of $210,000.00 together with interest at the rate of 11% per annum. The promissory note balance of $2,239,200.00 is paid by Quiptape on a monthly basis in amounts equal to the rental payments due from Salber to Quiptape.

On November 24, 1980 F/S and Salber entered into an agreement with respect to Salber's commission for services rendered as the disclosed broker in the above transaction. The agreement provided in pertinent part as follows:

It is our understanding that 100% or $163,965 of our commission, plus interest at 13% per annum will be deferred until the earlier of your receipt of the principal of $210,000 on December 15, 1982 of the second Salber note, or any prior assignment or collection of the portion thereof to which we are entitled.... Further it is our understanding that you have authorized us or our affiliates to deduct from the payment due to you on December 15, 1982 the amount of $163,965 plus 13% per annum interest on our commission from closing to payment date.... It is our understanding that the deduction referred to in the preceding paragraph is to offset the amount of commissions that are owed to us pursuant to this agreement and upon your agreement to such deduction ... you will have ful-

filled your obligation to us for commissions in connection with the above mentioned transaction.

Thereafter, on November 28, 1980, F/S, Salber and Quiptape entered into a lengthy escrow agreement which provided in pertinent part as follows:

## ESCROW AGREEMENT

ESCROW AGREEMENT, dated November 28, 1980, among F/S COMPUTER CORPORATION ("FSC"), a Delaware corporation having an office and place of business at 1000 RIDC Plaza, Pittsburgh, Pennsylvania 15238, SALBER EQUIPMENT CORPORATION ("SEC"), a New York corporation, having an office and place of business at 54 Beatrice Lane, Old Bethpage, New York 11804, QUIPTAPE ASSOCIATES ("Quiptape"), a New York limited partnership, having an office and place of business at 103 Shrub Hollow Road, Roslyn, New York 11576 and SINGER HUTNER LEVINE & SEEMAN, A Professional Corporation (the "Escrow Agent"), having an office at 110 East 59th Street, New York, New York 10022.

## INTRODUCTION

Pursuant to a purchase agreement, dated November 26, 1980 (the "Purchase Agreement"), between FSC, as seller, and SEC, as buyer, FSC sold to SEC the equipment described in Exhibit A to the Purchase Agreement (the "Equipment"), and pursuant to a lease, dated November 26, 1980 (the "Lease"), between SEC, as lessor, and FSC, as lessee, FSC leased the Equipment from SEC. On the date hereof pursuant to a purchase agreement of even date herewith (the "Quiptape Purchase Agreement"), SEC sold the Equipment to Quiptape, and Quiptape assumed SEC's obligations under the Lease, the Collateral Assignment, dated November 26, 1980, between FSC and SEC, and the Limited Brokerage Agreement, dated November 26, 1980, between FSC and SEC.

Under the Quiptape Purchase Agreement, the purchase price payable by Quiptape to SEC for the Equipment is payable partly in cash and partly by delivery to SEC of Quiptape's Installment Note, the First Recourse Note and the Second Recourse Note (as those terms are defined in the Quiptape Purchase Agreement). Such three Notes are hereinafter called, the "Quiptape Installment Note", the "Quiptape First Recourse Note" and the "Quiptape Second Recourse Note", respectively. In order to induce FSC to consent to the Quiptape Purchase Agreement, and to secure SEC's obligations to FSC under SEC's Installment Note, First Recourse Note and Second Recourse Note (as those terms are defined in the Purchase Agreement) (hereinafter called the "SEC Installment Note", the "SEC First Recourse Note" and the "SEC Second Recourse Note", respectively), SEC, FSC and Quiptape are entering into this Escrow Agreement.

1. *Escrow Fund.* (a) As security for the payment by SEC of the SEC Installment Note, the SEC First Installment Note and the SEC Second Installment Note, SEC has deposited with the Escrow Agent the Quiptape Installment Note, the Quiptape First Recourse Note and the Quiptape Second Recourse Note (more fully described in Schedule A annexed) (the "Escrow Fund"), the receipt of which the Escrow Agent hereby acknowledges. Each of these notes has been endorsed in blank or is accompanied by a note power in the form attached hereto as Exhibit A.

(b) In addition, Quiptape hereby covenants that, immediately upon receipt from each limited partner listed in Schedule B hereto (the "Limited Partners") of payment under (i) the promissory notes of the Limited Partners, due October 31, 1981, listed in Schedule B hereto, Quiptape shall deposit with the Escrow Agent each such payment (by delivery of cash or certified check made payable to the order of the Escrow Agent or a person designated by the Escrow Agent, by wire transfer of funds as directed by the Escrow Agent, or by the delivery of a check of each Limited Partner made payable to Quiptape and endorsed by Quiptape to the order of the Escrow Agent or a person designated by the Escrow Agent) until such time as Quiptape has deposited with the Escrow Agent, in the aggregate, the sum of $171,317.06, representing the principal and interest due under the SEC First Recourse Note; and (ii) the promissory notes of the Limited Partners, due October 31, 1982, listed in Schedule B hereto, Quiptape shall deposit with the Escrow Agent each such payment until such time as Quiptape has deposited, in the aggregate, the sum of $265,871.52, representing the principal and interest due under the SEC Second Recourse Note. The deposits by Quiptape with the Escrow Agent of the amounts as contemplated herein shall be in full satisfaction of Quiptape's obligations under the Quiptape First Recourse Note and the Quiptape Second Recourse Note.

(c) The Escrow Fund shall be received and held by the Escrow Agent in escrow, in accordance with and subject to the terms and conditions of this Agreement.

2. *Distribution of Escrow Fund.* During the term of this Agreement, the Escrow Agent shall distribute the Escrow Fund as follows:

(a) If the Escrow Agent receives written notice from FSC that SEC is in material default in respect of the Purchase Agreement beyond any applicable grace or cure period as therein provided or the SEC Installment Note, the SEC First Recourse Note or the SEC Second Recourse Note, or that Quiptape is in material default in respect of the Quiptape Purchase Agreement beyond any applicable grace or cure period as therein provided or the Quiptape Installment Note, the Quiptape First Recourse Note or the Quiptape Second Recourse Note, the Escrow Agent shall forthwith notify SEC of receipt of such notice, and, subject to the provisions of Section 3 hereof on or be-

fore the tenth day following the giving of such notice, the Escrow Agent shall distribute to FSC the entire Escrow Fund.

(b) The Escrow Agent shall (i) distribute to FSC or its written designee, against receipt of the SEC First Recourse Note, the aggregate amount received pursuant to Section 1(b)(i) hereof within three (3) business days of receipt of such aggregate amount, and such distribution shall be applied towards the payment, or prepayment, as the case may be, of the principal and interest due under the SEC First Recourse Note, and (ii) distribute to (y) FSC or its written designee, against receipt of the SEC Second Recourse Note, of an amount equal to principal in the amount of $46,020 and interest then accrued on such amount at the rate of 13% at such time that such amounts have been paid to the Escrow Agent (the "FSC Payment") pursuant to Section 1(b)(ii) hereof within three (3) business days of receipt of such amount and (z) Salber Equipment Co. ("Salber") an amount equal to $163,980 and interest then accrued on such amount at the rate of 13%, at such time such amounts have been received by the Escrow Agent but only after FSC has received the FSC Payment. The distributions by the Escrow Agent as contemplated herein shall be in full satisfaction of SEC's obligations under the SEC First Recourse Note and the SEC Second Recourse Note.

Subsequent thereto, Bersal Equipment Company, a company owned by the same persons as Salber, brokered a separate but similar transaction involving F/S, Bersal, and Billrich Associates. On April 15, 1981, Bersal purchased IBM computer equipment from F/S which had been leased in October, 1980 by F/S to Preferred Risk Mutual Insurance Companies for 36 months at an aggregate rental of $2,069,460.00. The purchase price consisted of $5,000.00 paid at closing together with an interest prepayment of $71,380.00; Bersal's promissory note to the order of F/S in the total sum of $157,920.00 ($16,920.00 of which was interest) due on February 15, 1982; a sec-

ond Bersal promissory note to the order of F/S in the total sum of $199,189.71 ($42,-089.71 of which was interest) due on February 15, 1983; and Bersal's long-term promissory note to the order of F/S, payable in 84 monthly installments, the first 33 of which are $15,603.70 per month; and the last 51 of which are $50,986.34 per month, including interest at 16% per annum. The Bersal promissory notes to the order of F/S due on February 15, 1982 and February 15, 1983 included, as part of their principal amount, pre-payments of interest on the long-term promissory note.

Bersal then leased the equipment back to F/S. The F/S rental payments do not exceed the aforementioned note payments. With the consent of F/S, Bersal sold the equipment and assigned its F/S lease to Billrich.

The parties then entered into an escrow agreement similar to the F/S-Salber-Quiptape Agreement, wherein as security for the payment by Bersal of the Bersal Installment Note, the Bersal First Recourse Note, and the Bersal Second Recourse Note, Bersal would deposit with the Escrow Agent the Billrich Installment Note, the Billrich First Recourse Note, and the Billrich Second Recourse Note, endorsed in blank or accompanied by a note power.

The escrow agreement provided that upon payment under the promissory notes of Limited Partners due January 15, 1982, Billrich would deposit with the Escrow Agent each payment until such time as it had deposited a sum equal to the principal and interest due under the Bersal First Recourse Note. Upon receipt of payment due under promissory notes of Limited Partners due January 15, 1983 Billrich would deposit each payment until such time as it had deposited a sum equal to the principal and interest due under the Bersal Second Recourse Note.

The escrow agreement provided that if the escrow agent received notice of Bersal or Billrich's material default beyond any grace or cure period, the entire escrow fund would be distributed to F/S. The

Escrow agreement further required the escrow agent to distribute to F/S the amount received pursuant to the notes due January 15, 1982. With regard to payments received by escrow agent pursuant to the notes due January 15, 1983, the escrow agent was required to distribute to Bersal the sum of $116,761.90 together with interest at 15%; and the sum of $40,388.10 plus interest at 15% to F/S.

In its petition, petitioners allege as follows. The escrow agent is currently holding funds which are the net result of a set-off, agreed to by the parties in November, 1980, in which a commission due to Salber and Bersal from F/S is offset against promissory note obligations due to be paid to F/S by Salber and Bersal.

In its brief, petitioners further aver that the $150,800.00 promissory note of Quiptape to Salber due November 30, 1981 together with interest (an aggregate total of $171,317.06) was collected and the proceeds paid to the order of F/S pursuant to an Order of Court dated February 8, 1982. Petitioners also state that the Quiptape promissory note due November 30, 1982 has been paid in full, including interest, in the total amount of $265,871.52. Funds are presently being held by the escrow agent, who has refused to release them unless the Court provides an order sanctioning such release in accordance with the escrow agreement.

In its brief, petitioners argue that the bankruptcy laws do not affect the right of a creditor to offset a mutual debt owing by such creditor to the debtor, provided that the mutual debt arose more than ninety days before the filing of the petition by the debtor; and further provided that the debt was not incurred for the purpose of obtaining a right of set-off against the debtor.

In its answer to the petition for relief from the automatic stay, F/S avers that by requesting such relief, petitioners acknowledge that the funds in escrow are property of the estate. F/S further states that but for the escrow arrangement here at issue, Salber and Bersal would be unsecured creditors of F/S as are numerous other parties who postponed the receipt of commission payments. F/S avers that the monies paid into the escrow were monies due to F/S, and at the date of bankruptcy were, insofar as evidenced by the note or monies paid pursuant to the note, property of the estate.

F/S further alleges that petitioners' reliance upon the principles of set-off is inappropriate, for the escrow agent, unless specifically designated as the exclusive agent for the secured party, cannot serve to perfect a security interest for the benefit of a secured party. Further, as of the date of filing, the notes had not been fully paid, so no right to set-off had arisen.

In its brief, F/S argues that set-off is not the applicable principle, for the element of mutuality required by § 553 of the Bankruptcy Code is not present. F/S argues that although the funds in payment on the notes due F/S were payable by Quiptape and Billrich, the alleged commission claimed as set-off through the vehicle of the escrow agent is the commission not of Quiptape and Billrich but rather the commission of Salber and Bersal. F/S concludes that the proceeds of the Billrich and Quiptape obligations are "owned" by F/S in the hands of the escrow agent and the only rights of Salber and Bersal arose after the petition in bankruptcy. When those rights, if any, arose the elements of mutuality for set-off were not present.

In petitioners' rebuttal to the Debtor's Reply, petitioners argue as follows. The funds paid to the escrow agent were paid by third parties pursuant to notes payable to the petitioners, not F/S. The order requested by petitioners would permit the escrow agent to use those funds to satisfy the mutual obligations between F/S and the petitioners, as contemplated in the escrow agreement, by paying to F/S the net balances of funds due to it after setting-off the F/S obligations to the petitioners arising out of their mutual transactions. While those funds are in the hands of the escrow agent, they cannot be deemed to be property of the estate. Pursuant to the escrow agreement, F/S could only claim

title to the escrow funds if it had complied with Article 2(a) thereto by delivering to the escrow agent written notice that Salber or Bersal were in material default beyond any applicable grace period. Petitioners further argue that for purposes of set-off, there is mutuality between F/S and Salber/Bersal.

■ After careful review of the complex documents before the Court, the Court is convinced that the principle of set-off is inapplicable to resolution of the dispute at bar. Despite the allegations of F/S that the commissions here in question were earned and payable as pre-petition debts, an analysis of the escrow agreement leads to a different conclusion. By the terms of the escrow agreements, the funds from which petitioners now seek payment of their commissions were created from payments made to the escrow agent of promissory notes not due until October 31, 1982 in the case of Salber; and January 15, 1983 in the case of Bersal. Pursuant to the terms of the escrow agreements, the obligation to pay commissions to Salber and Bersal did not arise until after those dates; both of which were subsequent to the filing of the petition in bankruptcy. The Court is therefore satisfied that the commissions here in question are post-petition debts. As such, they cannot be set-off against pre-petition obligations of the Debtor, for the requisite element of mutuality is lacking. *Matter of Haffner*, 25 B.R. 882 (Bkrtcy.N.D.Ind. 1982).

■ The Court now addresses the argument of F/S that the funds currently held in escrow are property of the estate pursuant to § 541 of the Bankruptcy Code. Section 541 provides that the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. The provision is broad and includes both tangible and intangible property. 4 *Collier on Bankruptcy* 541.01 at 541–5 (15th Ed.1983).

■ However, as of the commencement of the case, the two funds from which Salber and Bersal respectively seek pay-

ment of their commissions were not yet in existence. Further, by the terms of the escrow agreements, the interest of F/S in those portions of the two funds payable to petitioners as commissions was to arise only in the event of default by Salber and/or Quiptape; and Bersal and/or Billrich. It is undisputed that such a default never occurred. Therefore, notwithstanding the broad scope of § 541, the Court is satisfied that the funds currently held in escrow do not constitute property of the estate. Accordingly, the Court authorizes the escrow agent to distribute the escrow funds in accordance with the escrow agreement between F/S, Salber and Quiptape, dated November 28, 1980 (attached as Exhibit 2 to petitioners' complaint); and the escrow agreement between F/S, Bersal and Billrich, dated April 15, 1981, (attached as Exhibit 5 to petitioners' complaint.)

An appropriate order will be entered.