In re CEDAR RAPIDS MEATS, INC., d/b/a Farmstead Foods, Debtor.

CEDAR RAPIDS MEATS, INC., dba Farmstead Foods, Plaintiff,

v.

William HAGER, or his Successor, Commissioner of Iowa Insurance Division, Defendant.

Bankruptcy No. L–90–00445C.
Adv. No. L–90–0065C.

United States Bankruptcy Court, N.D. Iowa.

Nov. 20, 1990.

in the proceeds of the collateral than it already possessed.

that C.R. Meats claims is executory. C.R. Meats alleges that the Insurance Commissioner wrongfully acquired property held in escrow pursuant to a self-insurance agreement between C.R. Meats and the Insurance Commissioner. C.R. Meats claims that the acquisition constituted an avoidable preferential transfer under 11 U.S.C. § 547,[1] an avoidable post-petition transfer under § 549, and a violation of the automatic stay under § 362. C.R. Meats' complaint also asks the Court to determine that the escrow fund constitutes property of the estate and should be turned over under § 542 and that the contract underlying the escrow fund is an executory contract which may be rejected under § 365. The Court allowed a group of claimants to the worker's compensation fund to intervene as defendants. All of the parties have filed motions for summary judgment. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) & (F). The following constitutes this Court's findings of fact, conclusions of law, and order pursuant to Fed.R. Bankr.P. 7052.

### FINDINGS OF FACT

The material facts are not in dispute. Plaintiff, debtor, Cedar Rapids Meats, Inc. ("C.R. Meats") was active in the business of packing and distributing meat before filing for Chapter 11 bankruptcy on March 14, 1990. The defendant is Commissioner of Iowa's Insurance Division ("Commissioner"). During the time C.R. Meats actively operated the meat packing business, C.R. Meats was an employer subject to the Iowa laws governing worker's compensation, Chapters 85, 86, and 87 of the Code of Iowa.

Iowa Code § 87.1 requires every employer under the purview of the worker's compensation provisions to furnish insurance for worker's compensation liability. Iowa Code § 87.11, however, allows an employer to obtain relief from the insurance requirements if the employer can prove its financial ability to pay claims, or if the employer deposits satisfactory security with the Commissioner to guarantee payment of the

Thomas J. Lallier, Minneapolis, Minn., Thomas J. Wilkinson, Jr., Cedar Rapids, Iowa, for plaintiff/debtor.

Theodore R. Boecker and Fred M. Haskins, Asst. Atty. Gen., Des Moines, Iowa, for defendant.

Matthew J. Brandes and James E. Shipman, Cedar Rapids, Iowa, for intervenors.

### RULING RE: COMPLAINT TO RECOVER PROPERTY

MICHAEL J. MELLOY, Chief Judge.

This matter is before the Court on the complaint of plaintiff, debtor, Cedar Rapids Meats, Inc. C.R. Meats seeks to recover property from defendant, the Insurance Commissioner for the state of Iowa, that C.R. Meats claims is part of its bankruptcy estate. C.R. Meats also seeks to reject a contract with the Insurance Commissioner

---

1. All statutory references are to Title 11, United States Code, unless otherwise indicated.

claims. Under the Iowa Administrative Code the employer must post a surety bond or "if an employer cannot obtain a bond, any other security such as cash or negotiable securities which is agreeable to the Commissioner." Iowa Admin. Code, § 191–57.3(1).

In May of 1988, C.R. Meats contacted the Commissioner to discuss the possibility of obtaining relief from the worker's compensation insurance requirements. C.R. Meats sought to obtain a self-insured status under Iowa Admin. Code § 191–57.3. In a letter dated June 10, 1988, the Commissioner granted C.R. Meats relief from the insurance provisions subject to certain conditions.

The Commissioner granted this relief pursuant to § 87.11 of the Iowa Code. One of the conditions for relief was that C.R. Meats execute an escrow fund agreement with the Commissioner whereby C.R. Meats would deposit two million dollars in escrow by April 1, 1989, to serve as a guarantee fund for the payment of the worker's compensation claims. C.R. Meats and the Commissioner completed the escrow agreement on June 30, 1988. The agreement was titled "ESCROW FUND AGREEMENT AS SECURITY UNDER IOWA WORKER'S COMPENSATION LAW." The terms of the escrow agreement required C.R. Meats to make four cash deposits of $500,000, totalling two million dollars, into an escrow fund with the Merchants National Bank of Cedar Rapids, Iowa ("MNB"). MNB served as the escrow agent. C.R. Meats made all of the required payments into the fund. The fund contained only cash and negotiable securities.

The agreement specified that C.R. Meats could maintain its self-insured status as long as C.R. Meats continued to pay awards for worker's compensation claims as they became due. However, the agreement provided that if C.R. Meats failed to pay the claims within 30 days after those claims became final, the Commissioner would consider C.R. Meats to be in default on the agreement. The agreement required the Commissioner to certify such a

default. In the event of a default, the agreement required C.R. Meats to order the escrow agent to pay the funds over to the Commissioner in an amount necessary to satisfy the worker's compensation claims not paid.

Once C.R. Meats acquired the self-insured status, C.R. Meats was under a continuing obligation to pay the worker's compensation claims as they became due. The agreement required the Commissioner's office to monitor the escrow, direct investment of the funds, certify defaults by C.R. Meats in compliance with the fund agreement, and in the event of default direct administration of the fund.

The escrow agreement also provided that the escrow fund should not be used to pay legal fees for C.R. Meats, nor could the escrow fund be subject to attachment, levy, or execution based on claims other than the claims described in the agreement itself. In short, the fund was to be used for no other purpose than payment of worker's compensation claims. The agreement provided specifically that the interest earned on the money in the fund accrued to the fund. The total amount of money in the fund after adding interest is approximately $2.2 million. The agreement limited C.R. Meats' interest in the fund to the money remaining in the fund at the termination of the agreement.

The parties operated under that agreement without incident until February of 1990, when the Commissioner became aware of C.R. Meats' failure to meet its obligation under the agreement to pay worker's compensation claims. The failure to pay continued until March 6, 1990, when the Commissioner certified C.R. Meats to be in default. The Commissioner appointed a receiving agent for the funds on that same day.

On March 7, 1990, the Commissioner ordered MNB to transfer the escrow fund to the Commissioner. In a letter dated March 13, 1990, MNB confirmed that it had complied with the Commissioner's directive and transferred the funds to the Commissioner. MNB also determined that as a matter of administrative convenience a new account

would be established at the Bank, with a new account number, in the name of the Commissioner. On March 13, 1990, MNB transferred $1,648,232.31 into the new account. C.R. Meats filed for bankruptcy the next day, March 14, 1990. MNB physically transferred the remaining $565,000 of funds held in the escrow account into the new account in the name of the Commissioner on March 19, 1990. Since MNB transferred the funds, the Commissioner has continued to use the funds to pay the worker's compensation claims entered against C.R. Meats.

C.R. Meats, as debtor-in-possession, filed a complaint asking this Court to enjoin the Commissioner from making or authorizing any further payments from the fund until further order of the Court. The Court denied the injunction request. C.R. Meats subsequently amended the complaint to allege that under a variety of sections of the Bankruptcy Code, the fund must be returned to the C.R. Meats' bankruptcy estate.

In particular, C.R. Meats contends that any funds transferred by MNB to the Commissioner pre-petition constitute an avoidable preferential transfer under § 547, that any funds transferred post-petition constitute an avoidable post-petition transfer under § 549, or that the funds constitute property of the estate that the Commissioner should turn over to C.R. Meats under § 542. C.R. Meats additionally contends that at best the Commissioner has an unperfected security interest in the fund which may be avoided under § 544. C.R. Meats also contends that the escrow agreement itself is an executory contract and may be rejected under § 365.

C.R. Meats has filed a motion for summary judgment on this complaint. The Commissioner and the Intervenors have resisted the C.R. Meats' motion and filed their own motions for summary judgment. Both the Commissioner and the Intervenors have argued primarily that C.R. Meats has no interest in the funds since the escrow fund was not property of the C.R. Meats estate under § 541 and, therefore, C.R. Meats is not entitled to recover the fund under any of the theories in their complaint.

This Court heard arguments on the matter on August 22, 1990. At the hearing, the Court raised a question about whether the Commissioner held a perfected security interest in the funds. The parties responded with supplemental briefs on the question. C.R. Meats contends that the parties never intended to create a security agreement and, therefore, that the Commissioner never held a properly perfected security interest in the fund. The Commissioner and Intervenors, on the other hand, contend that to the extent the escrow fund is found to be property of the estate, a security agreement was created which the Commissioner properly perfected under the Iowa version of the Uniform Commercial Code.

## CONCLUSIONS OF LAW

All three parties have filed motions for summary judgment in this proceeding. In order for any party to prevail on its motion for summary judgment that party must satisfy Fed.R.Bankr.P. 7056, which incorporates Fed.R.Civ.P. 56. Under Rule 56 summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to relief as a matter of law." Fed.R.Civ.P. 56(c). This rule essentially provides a two-step analysis. *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 914 (7th Cir.1989) (citations omitted). First, a moving party must demonstrate that there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Thomas*, 890 F.2d at 914. Then, the moving party must demonstrate that on those undisputed facts, they are entitled to relief as a matter of law. *Thomas*, 890 F.2d at 914.

 The Eighth Circuit Court of Appeals has emphasized, however, that in order for a party to prevail on a motion for summary judgment, that party must establish the right to a judgment with such

clarity that there is no room for controversy. *Bufford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.1984). Yet, the mere existence of a factual dispute is insufficient alone to bar summary judgment unless the factual dispute is outcome determinative under the prevailing law. *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989). Here, the parties contend that there is no dispute as to material facts which could be outcome determinative. This Court agrees with the parties and finds that there is no genuine issue of material fact. Hence, entitlement to summary judgment in this matter hinges on whether any party can demonstrate that it is entitled to judgment as a matter of law.

## I. PROPERTY OF THE ESTATE

C.R. Meats contends that it is entitled to recover the funds held by the Commissioner under §§ 542, 547, and 549 of the Bankruptcy Code. All of these Code sections assume that the property the debtor-in-possession or trustee seeks to recover could be considered property of the debtor's estate.[2] Both the Commissioner and the Intervenors argue that the funds are not property of the C.R. Meats' estate and, therefore, that none of these sections will allow C.R. Meats to recover the funds for the estate. Hence, the threshold issue in this matter is whether any portion of the funds from the escrow are property of the debtor's estate.

Under § 541(a)(1) a debtor's estate consists of "all legal or equitable interests of the debtor in property as of commencement of the case." 11 U.S.C. § 541(a)(1) (1988). Section 541(a)(1) provides a broad definition encompassing "all apparent interests of the debtor." *In re Peterson*, 897 F.2d 935, 936

(8th Cir.1990) (citing *In re Graham*, 726 F.2d 1268, 1270–71 (8th Cir.1984)). In noting that this broad provision is not without limits, however, the Eighth Circuit noted:

> The definition was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case. In fact, the broad definition of the debtor's estate is modified and limited by subsection (d) of section 541 of the Code. 11 U.S.C. § 541(d) states:
>
> > Property in which the debtor holds, as of commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent that the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
>
> Thus, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest.

*In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir.1985). The broad definition of property of the estate also is limited by case law. For example, in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the Supreme Court noted that the legislative history of § 541 demonstrates a Congressional intent to exclude minor interests that the debtor holds from becoming property of the estate. *See N.S. Garrott*, 772 F.2d at 466 (citing *Whiting Pools*, 103 S.Ct. at 2313 n. 8). The *N.S. Garrott* court summed up the law of § 541 as "suggesting that an interest limited in the hands of the debtor is

---

**2.** For example, under § 547 a party can recover a preferential transfer of "property of the debtor." 11 U.S.C. § 547(b). The United States Supreme Court has held that " 'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been property of the estate had it not been transferred before the commencement of the bankruptcy proceedings." *Begier v. IRS,* —— U.S. ——, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). The Court went on to note that "[f]or guidance, then, we must turn to § 541, which delineates the scope of property of the estate and serves as the post-petition analog to

§ 547(b)'s 'property of the debtor.' " *Id.* Further, under § 549, the trustee may avoid certain post-petition transfers of "property of the estate." 11 U.S.C. § 549(a). The Eighth Circuit Court of Appeals has noted that the most basic requirement of 11 U.S.C. § 549(a) is a "transfer of property of the estate." *In re Newman,* 875 F.2d 668, 670 (8th Cir.1989). Similarly, § 542(a) requires "one in possession of property of the bankruptcy estate ... to deliver such property to the trustee unless it is of inconsequential value or benefit to the estate." *Matter of Pester Refining Co.,* 845 F.2d 1476, 1480 (8th Cir.1988) (citing 11 U.S.C. § 542(a)).

equally limited in the hands of the estate." *N.S. Garrott*, 772 F.2d at 466.

The property in which C.R. Meats claims an interest are the funds MNB held in escrow which guaranteed that C.R. Meats would pay worker's compensation claims. The Commissioner now holds the funds. The Commissioner and the Intervenors contend that the funds should be excluded from C.R. Meats bankruptcy estate since MNB held the funds in escrow or trust at the time of the transfers and at the date C.R. Meats filed for bankruptcy. To the extent that C.R. Meats is arguing to turn over of property of the estate under § 542, they must demonstrate by clear and convincing evidence that the escrow agreement is property of the debtor's estate. *In re Dolphin Titan*, 93 B.R. 508, 512 (Bankr. S.D.Tex.1988) (citing *First National Bank of Clinton v. Julian*, 383 F.2d 329 (8th Cir.1967).

Funds held in escrow or trust present difficult property of the estate questions for courts. *See In re World Communications*, 72 B.R. 498, 500 (D.Utah 1987); *In re Sun*, 116 B.R. 767, 772 (Bankr.D.Haw. 1990). The cases are divided on the question of whether escrow funds are property of the estate. Some courts hold that the escrow funds are property of the estate. *See, e.g., In re Missionary Baptist Found. of Am., Inc.*, 792 F.2d 502, 506 (5th Cir. 1986); *In re Nield*, 95 B.R. 259, 261 (Bankr.D.Me.1989); *In re Leff*, 88 B.R. 105, 108 (Bankr.N.D.Tex.1988); *In re World Communications, Inc.*, 72 B.R. at 501; *In re Berkley Multiunits, Inc.*, 69 B.R. 638, 642 (Bankr.M.D.Fla.1987). Conversely, other courts have held that funds held in escrow are not property of the estate. *See, e.g., In re Newcomb*, 744 F.2d 621 (8th Cir.1984); *In re Sun*, 116 B.R. at 772; *In re Dolphin Titan Int'l*, 93 B.R. 508, 512 (Bankr.S.D.Tex.1988); *Creative Data Forms, Inc. v. Pa. Minority Business Dev. Auth.*, 72 B.R. 619, 623–24 (E.D.Pa.1985); *In re Palm Beach Heights Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr.S.D.Fla. 1985); *In re O.P.M. Leasing Serv., Inc.*, 46 B.R. 661, 668 (Bankr.S.D.N.Y.1985); *In re F/S Computer Corporation*, 38 B.R. 384, 390 (Bankr.W.D.Pa.1984). A debtor's

rights in property for property of the estate purposes are determined by state law. *N.S. Garrott*, 772 F.2d at 466; *In re Sun*, 116 B.R. at 772. Under Iowa escrow law, however, this appears to be a case of first impression. Hence, this Court will look to decisions in other jurisdictions for guidance.

Whether the escrow fund is property of a debtor's estate "depends entirely on the nature and circumstances of the escrow agreement." *In re Sun*, 116 B.R. at 771 (quoting *In re World Communications*, 72 B.R. at 498). The factors relevant in this determination include, but are not limited to, "whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it, the nature of the funds put into it, the recipient of its remainder (if any), the target of its benefit, and the purpose of its creation." *In re Sun*, 116 B.R. at 772 (quoting *World Communications*, 72 B.R. at 498). The cases, however, do not expound on the relative weight of each factor and the way in which each factor should influence the decision.

The particular nature of the escrow in this case stems from the underlying contract, the escrow agreement, between the parties. Under the contract the escrow fund's purpose is to act as security to guarantee that C.R. Meats pays worker's compensation claims. The Commissioner required C.R. Meats to establish the fund to assure payment of the worker's compensation claims. The contract terms entitle the debtor to only the funds remaining after all worker's compensation claims are paid.

In cases where the escrow arrangement acted as an assurance or guarantee fund, courts have found that the escrow funds are not property of the estate. For example, the escrow arrangement before this Court is very similar to the one that was before the court in *In re Dolphin Titan*, 93 B.R. 508 (Bankr.S.D.Tex.1988). In *Dolphin Titan*, the debtor placed money into an escrow fund which served to assure payment of worker's compensation claims. Under the escrow fund agreement, the debtor, Dolphin Titan, was to receive only

the excess amounts in the fund when the agreement was terminated. The agreement governing the escrow fund in *Dolphin Titan* also shared a number of other similarities with the case before this Court. The *Dolphin Titan* court concluded that the escrow fund was not property of the debtor's estate. *Dolphin Titan,* 93 B.R. at 512. The court specifically stated that "[a]n assurance fund where the debtor has no claim or interest in the fund until all prior claims have been paid in full, is not property of the estate." *Dolphin Titan,* 93 B.R. at 512 (citing *In re Palm Beach,* 52 B.R. 181). The *Dolphin Titan* court went on to conclude that "for the court to release the fund to the Debtor would be contrary to the agreement between Debtor and [the creditor], and convert Debtor's contingent right [to the fund] into a non-contingent right." *Dolphin Titan,* 93 B.R. at 512 (citing *Creative Data Forms,* 41 B.R. 334 (Bankr.E.D.Pa.1984)).

The *Palm Beach* case which the *Dolphin Titan* court relied on, also dealt with an escrow arrangement where the fund was established to assure that the debtor performed certain obligations. In *Palm Beach* the debtor established a $12.6 million escrow fund to guarantee the debtor would complete certain drainage and road improvement work. The *Palm Beach* court concluded that the assurance fund itself was not property of the estate. In reaching this conclusion, the *Palm Beach* court noted:

> Said fund is a trust or escrow to assure the completion of the road and drainage improvements on the property and only upon completion of the improvements would debtor have any interest in the fund. Any claim, contingency or chose in action against the trust fund is the property of the estate but the fund itself is not. The debtor may not have any part of said fund until such time as the debtor establishes that all prior claims in the fund have been paid and that a residuum remains to which it is entitled.

*In re Palm Beach,* 52 B.R. at 183. The *Palm Beach* court dealt specifically with the debtor's demand that the funds be turned over to the debtor pursuant to § 542.

The holdings in these assurance fund cases comport with Eighth Circuit precedent. *In re Newcomb,* 744 F.2d 621 (8th Cir.1984), is the leading case which finds that an escrow fund is not property of the debtor's estate. In *Newcomb* the court noted, in interpreting Missouri law, that "an escrow is something more than a contract—it is a method of conveying property [and] when property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement." *Newcomb,* 744 F.2d at 624. Further, the court observed that "once the escrow was created the *only* interest in the escrow funds remaining in the debtor was a contingent right to the funds ..." if the conditions of the escrow were satisfied. *Newcomb,* 744 F.2d at 627 (emphasis added).

The *Newcomb* court implicitly recognized that an escrow account sets aside funds in a special way, and that under such an arrangement the only right a party possesses outside bankruptcy is a contingent right to the remainder. Hence, if a debtor has a contingent right outside bankruptcy, the rights in the hands of the debtor-in-possession in bankruptcy should be the same. *See N.S. Garrott,* 772 F.2d at 466 (noting that the estate does not take any better interest than the debtor held outside bankruptcy). It should be noted, however, the *Newcomb* court's conclusion the debtor had no interest in the escrow fund was based in part on the fact that all the contingencies of the escrow agreement had been fulfilled. The case, however, does not address itself to a situation where the contingencies of the agreement are not fulfilled.

C.R. Meats makes many allegations in this case that the contingencies of the escrow agreement have not been fulfilled. In particular, C.R. Meats argues that the Commissioner did not follow the terms of the escrow agreement for taking possession of the fund. Moreover, C.R. Meats has made some allegation that the Commissioner took possession of more of the ac-

count than it should have or, in the alternative, that the Commissioner's action was wholly precipitous and the Commissioner should not have withdrawn any of the fund. The merits of these contentions, however, do not effect the decision immediately before this Court.

As the court in *Palm Beach* specifically noted "any claim, contingency, or chose in action against the trust [or escrow] fund is the property of the estate, but the fund itself is not." 52 B.R. at 183. The *Palm Beach* court went on to note that "the debtor may not have any part of said fund until such time as the debtor establishes that all prior claims in the fund have been paid and that a residuum remains to which it is entitled." 52 B.R. at 183. The *Palm Beach* rationale is persuasive. The C.R. Meats bankruptcy estate contains the claim against the fund for any residuum which may remain after all worker's compensation claims are paid but not the fund itself. Hence, C.R. Meats will get the funds when it can establish "that all prior claims in the fund have been paid and that a residuum remains to which it is entitled." *Palm Beach*, 52 B.R. at 183.

■ The conclusions of this Court that the escrow fund itself is not property of the estate, and that the debtor is entitled to only its interest in the contingency or claim against the fund, are in line with the broader principles of property of the estate. As the Eighth Circuit noted in *N.S. Garrott* "an interest limited in the hands of the debtor is equally limited in the hands of the estate." 772 F.2d at 466. Here, the court has awarded C.R. Meats its claims in the contingent remainder, which is the amount C.R. Meats legally is entitled to under the escrow contract.

The decision here also gives effect to the intent of the parties to the escrow agreement. C.R. Meats receives what it bargained for under the agreement, and no more. Like the escrow arrangements in

*Dolphin Titan* and *Palm Beach*, the purpose of the fund in the present case is to assure that the debtor completes an obligation. C.R. Meats' obligation is to pay worker's compensation claims before C.R. Meats is entitled to the remaining funds. Hence, this decision allows the parties agreement outside of bankruptcy to effect the same result in bankruptcy and the estate takes a contingent interest in the fund.[3]

The fact that the fund is now in the hands of the Commissioner does not change the result. The Commissioner is under a continuing duty to use the funds only to pay the worker's compensation claimants. When all of the claimants have been paid, the Commissioner is under an obligation to return the remaining funds to the C.R. Meats bankruptcy estate.

## II. TRANSFER TO COMMISSIONER AS A PREFERENCE

■ Deciding that the fund itself is not property of C.R. Meats' estate disposes of C.R. Meats' argument that the transfer of the money from the escrow account to the Commissioner constituted a pre-petition preference under § 547. *See Begier v. IRS*, —— U.S. ——, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) (holding that a transfer under § 547 must be a transfer of property that could be part of the debtor's estate). However, even if this Court had decided that the fund was property of the estate, the preference argument would fail nonetheless. The *Newcomb* court and the vast majority of other courts have held that for purposes of § 547, the relevant transfer of property in an escrow arrangement is the deposit of funds into the escrow, not any transfers later made out of the fund. *Newcomb*, 744 F.2d at 626–27; *In re Coco*, 67 B.R. 365, 369 (Bankr.S.D.N.Y.1986) (citing *O.P.M.*, 46 B.R. at 668 and *Burch v.*

---

**3.** This Court is not holding that the actual escrow fund never can become property of the estate. The Court does conclude, however, that given the particular circumstances and nature of this agreement, awarding the fund to the estate is not appropriate. *See In re Sun*, 116

B.R. at 771–72 (citing *In re World Communications*, 72 B.R. at 500–01) (both noting that the particular nature of the agreement governs the determination whether the fund is property of the estate).

*Bond Adjusters, Inc. (In re Pelc)*, 34 B.R. 823 (Bankr.D.Or.1983)).

Here, C.R. Meats deposited the cash into the escrow fund on four different dates. The last of these four dates is April 1, 1989, which is more than 11 months before C.R. Meats filed for bankruptcy on March 14, 1990. A preferential transfer under § 547 requires that the transfer in question be within 90 days of the bankruptcy, or one year of the bankruptcy if the transfer was made to an insider. § 547(b)(4). There has been no allegation in this case that the transfer was made to an insider. Under *Newcomb* and the majority view, the transfer in question here is not a preference under the requirements of § 547(b). Hence, C.R. Meats cannot recover any of the $2.2 million fund on a preference theory even if the Court found that the funds are property of the estate.

The *Newcomb* court's position on the timing of the transfer for preference purposes further bolsters this Court's conclusion that the fund is not property of the estate here. By noting that the critical time of the transfer is the deposit into the escrow, the *Newcomb* court recognizes the segregated nature of funds held in escrow. *See Newcomb*, 744 F.2d at 627. The preference, by its very definition, is a transfer that benefits a creditor. By holding that the creditor attains the benefit when the money is deposited in escrow, the courts recognize that the debtor retains only a contingent interest in the fund from that point forward.[4]

It also should be noted that the parties spent a good deal of time arguing about whether the funds held in escrow constituted a statutory trust, which also would exclude the fund from being property of the estate. Without deciding that issue, the Court notes that the escrow fund in this agreement is the functional equivalent of a statutory trust. Both provide a segregated, set aside fund to be used for a specific purpose with the remainder, if any, going back to the debtor when the purpose of the agreement is achieved. *Compare Matter of Lenk*, 48 B.R. 867 (W.D.Wisc.1985) with *Palm Beach* 52 B.R. at 181–84. Whether the technical attributes of a statutory trust are established in this case is not relevant since this Court already has found that the escrow fund is not property of the debtor's estate.

## III. ESCROW AGREEMENT AS A PERFECTED SECURITY AGREEMENT

Even if the Court were to assume, *arguendo*, that the escrow fund is property of the estate, the Commissioner holds a perfected security interest in the escrow fund. As many courts have recognized "a security interest is valid and enforceable only if there is evidence of an intent to create or retain a security interest." *O.P.M. Leasing Services, Inc.*, 46 B.R. at 669 (citing *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir.1973)) (other citations omitted). The Court should look to the parties contractual agreement to determine whether the parties intended to create a security interest. *O.P.M. Leasing*, 46 B.R. at 669 (citation omitted).

Iowa law and the escrow agreement itself demonstrate that the parties intended to create a security agreement. Iowa Code § 87.11 provides that employers required by law to provide worker's compensation insurance may obtain relief from this section if "such employer deposits with the Commissioner *security* satisfactory to the Insurance Commissioner ... as guarantee for the payment of such compensation." Iowa Code § 87.11 (emphasis added). The Iowa Admin. Code regulations which supplement § 87.11 of the Iowa Code provide that for an employer to acquire relief from the insurance requirement the employer must, if unable to obtain a bond, provide "any other *security* such as cash or negotiable securities which is agreeable to the Commissioner." Iowa Admin.Code

---

4. This Court's finding that the escrow fund is not property of the debtor's estate also has disposed of C.R. Meats allegations that they are entitled to recover some portion of the fund under either § 542 or § 549 of the Bankruptcy Code. *See supra* footnote 1. This finding also disposes of C.R. Meats' allegations that the Commissioner violated the automatic stay. *See* 11 U.S.C. § 362(a) (requiring action against debtor or property of the estate to violate the stay).

§ 191–57.3 (emphasis added). The escrow agreement between the parties is captioned *"ESCROW FUND AS SECURITY* UNDER IOWA WORKER'S COMPENSATION LAWS." (emphasis added). The agreement states the funds are being deposited with the escrow agent as "... security ... as guarantee for payment of compensation provided for in Chapter 87." Moreover, during the course of these proceedings, all of the parties regularly have referred to the agreement as a security agreement. The record is replete with evidence that the escrow fund agreement is a security agreement which provides the Commissioner with a security interest in the fund.

The question presented is whether the Commissioner perfected that security interest. The fund consists of money, mostly cash and negotiable securities. Iowa Code § 554.9304(1) (UCC § 9–304(1)) provides in relevant part that "a security interest in money or instruments ... can be perfected *only* by the secured parties taking possession ..." Iowa Code § 554.9304(1) (emphasis added). Iowa Code § 554.9305 (UCC § 9–305) describes "when possession by a secured party perfects a security interest without filing." That section states:

> a security interest in ... money ... may be perfected by the secured parties taking possession of the collateral. If such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured parties interest.

Iowa Code § 554.9305. Official comment two which accompanies this provision provides that: "possession may be by the secured party himself or by an agent on his behalf; it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party ..." *In re Rolain,* 823 F.2d 198, 199 (8th Cir.1987). Iowa Code § 554.11109 notes that these comments are evidence of the legislature's intent in enacting the statute.

In the matter before this Court, pursuant to the escrow agreement, C.R. Meats placed the funds in an escrow account with

MNB. MNB functioned as the escrow agent for both C.R. Meats and the Commissioner. The question here becomes whether MNB serving as the escrow agent for the parties was a bailee/agent for the Commissioner under § 9–305 so as to perfect the Commissioner's security interest in the fund.

The law is very clear that an escrow agent serving both parties can qualify as a bailee/agent under § 9–305. The leading case on this issue is *In re Copeland,* 531 F.2d 1195 (3rd Cir.1976). As the Eighth Circuit has observed, the *Copeland* court held "that an escrow agent, acting for the benefit of both parties, was a 'bailee with notice' within the meaning of 9–305 in that his possession perfected the creditor's security interest." *In re Rolain,* 823 F.2d at 199 (citing *Copeland,* 531 F.2d at 1203–04). "The purpose of the § 9–305 perfection requirement is to give notice to all current and potential creditors that the property was being used as collateral and could not be repledged." *Rolain,* 823 F.2d at 199 (citing *Copeland,* 531 F.2d at 1203–04; *Ingersoll–Rand Financial Corp. v. Nunley,* 671 F.2d 842, 844–45 (4th Cir.1982); *O.P.M.,* 46 B.R. at 678)). The *Copeland* court concluded that possession by an escrow agent who is not under the sole control of the debtor fulfills the notice function and is therefore a "bailee with notice" under § 9–305. *Copeland,* 531 F.2d at 1204. In *Rolain,* the Eighth Circuit wholly embraced the *Copeland* rationale and result. *In re Rolain,* 823 F.2d at 199–200. A majority of other courts which have faced the issue also have adopted the *Copeland* holding. MNB is a bailee/agent of the Commissioner under 9–305 and as such perfected the Commissioner's interest in the escrow fund.

C.R. Meats contends, however, that the contractual provisions found in the escrow agreement remove the agreement from § 9–305. C.R. Meats arguest that provisions in the escrow contract demonstrate that the parties did not intend to create a security agreement. In particular, C.R. Meats directs the Court's attention to the language prohibiting further encumbrances on the fund held in escrow. C.R. Meats

alleges that this language demonstrates the parties never intended to create a security agreement. In support of that argument, C.R. Meats cites *In re Kontaratos*, 10 B.R. 956 (Bankr.D.Me.1981). In *Kontaratos*, the court states that § 9–305 requires a bailee, and therefore the parties must have a proper bailment arrangement to qualify under 9–305. 10 B.R. at 968. The *Kontaratos* court then states "where the agreement between the pledgor and the pledgee-bailee expressly prohibits the creation of other encumbrances, there is no evidence of a conformable UCC § 9–305 bailment, and it would be unreasonable to imply one." 10 B.R. at 968. Hence, C.R. Meats argues that the presence of clauses restricting further encumbrances on the escrow fund demonstrates an intent of the parties to create something other than a security agreement.

This Court finds C.R. Meats argument to be unpersuasive. As noted previously there is substantial, if not overwhelming, evidence that the parties intended to create a security agreement. Counsel for C.R. Meats represented as much to the Court at the hearing in this matter.[5] Moreover, this Court is unpersuaded that the presence of language which limits further encumbrances on the fund destroys the necessary § 9–305 bailment. Such an argument provides an overly technical and crabbed view of § 9–305 which appears to be without substantial rationale. Conversely, this Court believes that the language in the agreement limiting encumbrances is a cautious, thorough, and common commercial arrangement; this Court has seen many security agreements which prohibit the debtor from further encumbering the security property. This Court instead finds that such language even more clearly indicates that the parties intended to create a security agreement and that the Commissioner was attempting to protect its collateral.

The Commissioner has satisfied the section 9–305 perfection requirement in this proceeding. The purpose of the section is to "give notice to all current and potential creditors that the property was being used as collateral and could not be repledged." *Rolain*, 823 F.2d at 199 (citing *Copeland*, 531 F.2d at 1203–04). That purpose is satisfied here. As § 9–305 envisions, all potential creditors of C.R. Meats would be on notice that the funds were encumbered since the funds were held by MNB, the escrow agent. Moreover, MNB had notice of the Commissioner's interest in the fund from the time the escrow agreement was established. Hence, based on the holding of *Copeland* and *Rolain*, this Court finds that the Commissioner held a perfected security interest in funds held by an escrow agent.

The fact that MNB no longer holds the funds in escrow does not affect the result. The Commissioner took possession of the funds from its escrow agent prior to the bankruptcy and those funds now are in an account in the Commissioner's name at MNB. As noted above, UCC § 9–304 provides that a party with a security interest in money or instruments can only perfect that interest by taking possession. Since the Commissioner took possession of the funds it already held a perfected security interest in, the act of taking possession only continued the Commissioner's secured position under UCC 9–305.

Given this conclusion, C.R. Meats' contention that the Commissioner's seizure of the fund prior to bankruptcy constituted a preferential transfer under § 547 also is without merit. Section 547 requires, among other things, that the transfer "enables such creditor to receive more than such a creditor would receive if the case were a case under chapter 7 of this title, the transfer had not been made, and such creditor receive payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5). Since the Commissioner has a perfected security interest in the entire fund, the transfer does not give the Commissioner more than the

---

5. The Court said to counsel "are you taking the position that this [escrow agreement] is a security agreement?" Counsel responded "yes, your honor." Counsel then went on to argue that the Commissioner possessed only an unperfected security interest in the fund.

Commissioner would have received under chapter 7. C.R. Meats fails to meet the facial requirements for a preference. Thus, C.R. Meats cannot recover the $2.2 million in the fund on a preference theory.

This conclusion, however, does not prevent C.R. Meats from asserting a claim to the fund for the amount that the Commissioner is over-secured. This amount essentially would be the amount of the fund remaining after all the claims for worker's compensation have been satisfied. The Commissioner, however, retains the fund in which it held a properly perfected security interest and is allowed to pay the claims from the fund.

C.R. Meats also has alleged that even if the Court determines that the escrow fund agreement created a security interest, the individual claims of worker's compensation claimants were not perfected under § 9–305 because the escrow agent had no notice of their claims. This Court points out, however, that the question before the Court is whether the Commissioner held a perfected security interest in the fund, not whether the worker's compensation claimants held a perfected interest in the fund. The escrow fund agreement was executed by C.R. Meats and the Commissioner. The funds were in the hands of the Commissioner on the date of filing, not the individual claimants. The debtor is trying to retrieve the funds from the Commissioner. The issue is whether the Commissioner has a valid right to the funds and whether transfer to the Commissioner was a preference.

## IV. THE ESCROW FUND AS AN EXECUTORY CONTRACT THAT MAY BE ACCEPTED OR REJECTED

■ C.R. Meats additionally contends that the escrow fund agreement constitutes an executory contract that C.R. Meats can reject under 11 U.S.C. § 365(a). That section provides in pertinent part that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11

U.S.C. § 365(a) (1988). C.R. Meats must demonstrate here that: (1) the escrow agreement is an executory contract and (2) the contract meets the standards for rejection.

C.R. Meats, however, cannot demonstrate that the escrow agreement with the Commissioner constitutes an executory contract. The Eighth Circuit specifically has noted in *Newcomb* that the debtor's argument the escrow arrangement could be rejected as an executory contract was "inapposite because the escrow involved in this case is something more than an executory contract." 744 F.2d at 624. The court based this conclusion, in part, upon the reasoning that "an escrow is something more than a contract—it is a method of conveying property." *Id.* This Court believes the escrow agreement in the present matter also "is something more than an executory contract" since the agreement conveys an interest in the fund to the Commissioner. Under such circumstances, *Newcomb* holds that the escrow agreement between the parties is not an executory contract subject to avoidance under § 365.

Moreover, the contract cannot be considered an executory contract under the prevailing definition. A contract is executory if it is a contract "on which performance remains due to some extent on both sides." *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1988) (citing H.R.Rep. No. 95–595, p. 347 (1977)). In the Eighth Circuit a contract is executory when "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Draper v. Draper,* 790 F.2d 52, 54 (8th Cir.1986) (citing *In re Knutson,* 563 F.2d 916, 917 (8th Cir.1977) (per curiam), citing Countryman, *Executory Contracts in Bankruptcy: Part 1,* 57 Minn.L.Rev. 439, 460 (1973)). In simple terms the case law requires that in order to have an executory contract both parties must have important

obligations remaining to be performed under the contract.

Here the Commissioner's remaining duties, which include monitoring the fund, making investment decisions, certifying defaults and directing the administration of the funds in a default situation, could be considered substantial and important unperformed obligations. C.R. Meats only important remaining duty was to continue to pay the workers' compensation claims as they became due. "It is 'well-established' that 'where all elements of performance have been accomplished leaving only an obligation to pay money,' there is no executory contract." *In re Dunes Casino Hotel*, 63 B.R. 939, 948 (D.N.J.1986) (quoting *In re Murtishi*, 55 B.R. 564, 569 (Bankr.N. D.Ill.1985) citing *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1046 (4th Cir.1985)). Since C.R. Meats only remaining obligation is to make payments the escrow agreement cannot be properly considered an executory contract.

■ Even assuming the escrow agreement constitutes an executory contract, rejection under § 365 would not be appropriate. While § 365 does not specify when rejection of a contract is appropriate, the courts generally require that the trustee or the debtor-in-possession's decision to reject meet a business judgment test. *See N.L. R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1194–95, 79 L.Ed.2d 482 (1988) (citing *Group of Institutional Investors v. Chicago, M., St. P. & P.R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943)) (other citations omitted). The primary issue under this test "is whether rejection would benefit the general unsecured creditors." *In re Blackstone Potato Chip Co., Inc.*, 109 B.R. 557, 560 (Bankr.D.R.I. 1990) (citing *In re Chi–Feng Huang*, 23 B.R. 798, 801 (Bankr. 9th Cir.1982) and *In re Meehan*, 46 B.R. 96, 100–01 (Bankr.E.D. N.Y.1985)). Here, rejecting the contract would not provide any greater benefit for unsecured creditors. The fund itself is not property of the estate and the contingent remainder of the fund will be available for distribution to the unsecured creditors when its value has been established. Allowing C.R. Meats to reject the contract will not provide the general unsecured creditor's any greater benefit. Assuming the fund is property of the estate, rejection would be of no benefit since C.R. Meats would take the funds subject to the Commissioner's validly perfected security interest. Consequently, rejection of the contract would provide no benefit to the estate.

## CONCLUSION

In conclusion, the Court finds that the escrow fund is not property of the bankruptcy estate. Further, if it is determined the escrow fund is property of the estate, the Court further finds that the Iowa Insurance Commissioner has a validly perfected security interest in the funds for the benefit of the worker's compensation claimants. Transfer of the funds to the Commissioner pursuant to a validly perfected security interest cannot be set aside as a preference. Accordingly, the only interest the debtor has in the fund is the residual monies which may remain after payment of all valid worker's compensation claims.

## ORDER

IT IS THEREFORE ORDERED that the complaint of the debtor to have the Iowa Insurance Commissioner turn over the escrow fund received from Merchants National Bank to the debtor-in-possession is denied.

DONE AND ORDERED.