**In re RISCMANAGEMENT, INC., Debtor.**

**In re RISCsoft, Inc., Debtor,**

**Harold B. Murphy, Chapter 7 Trustee, Plaintiff,**

v.

**Arrow Electronics, Inc. Defendant.**

**Bankruptcy Nos. 00–16970–JNF, 00–16969–JNF. Adversary No. 02–1390.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 5, 2004.

568

Andrew G. Lizotte, Esq., Hanify & King, P.C., Boston, MA, for plaintiff.

Jeffrey M. Galen, Esq., Warden, Gart & Galen, Encino, CA, for defendant.

## MEMORANDUM

JOAN N. FEENEY, Chief Judge.

### I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the Plaintiff, Harold B. Murphy, the Chapter 7 Trustee (the "Trustee" or the "Plaintiff") of the jointly administered estates of RISCmanagement, Inc. and its wholly owned subsidiary, RISCsoft, Inc. (collectively, "RISC"),[1] with respect to his Complaint to recover in excess of $575,000 in payments made to the Defendant, Arrow Electronics, Inc. ("Arrow"), on the ground that the payments are avoidable under 11 U.S.C. §§ 547(b) and 549(a)(1)(B). The Trustee also seeks summary judgment with respect to the defenses raised by Arrow under 11 U.S.C. § 547(c). Arrow, a distributor of electrical components, filed an Opposition to the Motion for Summary Judgment. The Trustee filed a Statement of Undisputed Material Facts and a Memorandum. Arrow also filed a Statement of Undisputed Material Facts in which it purportedly disputed some of the facts set forth in the Trustee's statement of facts, as well as a Memorandum. Both parties filed supplemental briefs following the hearing on the Trustee's Motion.

---

1. On October 24, 2003, the Court entered an order authorizing joint administration of RI-SCmanagement, Inc. and RISCsoft, Inc.

The issues presented are whether certain payments made by RISC to Arrow are recoverable as voidable preferential transfers and whether a postpetition transfer is voidable as having been unauthorized by the provisions of the Bankruptcy Code or this Court. Resolution of the issues depends, in part, on whether two escrow agreements executed by the parties during the preference period shield payments made by RISC to Arrow from RISC's general operating account as a result of a mistake made by RISC's customer, Genetics Institute, which sent its payments directly to RISC instead of to the address set forth in the escrow agreements.

## II. FACTS

RISCmanagement, Inc. and RISCsoft, Inc. filed voluntary Chapter 11 petitions on October 19, 2000. Less than one year later, on August 8, 2001, the Court converted the cases from Chapter 11 to Chapter 7, and Harold B. Murphy was appointed interim trustee in both cases.

Within the 90 day preference period, which commenced on July 21, 2000, RISC made the following payments to Arrow:

| CHECK NO. | INVOICE DATES | CHECK AMT. | CHECK ISSUANCE DATE | CHECK HONOR DATE | INVOICE TO PAYMENT AGING DAYS |
|---|---|---|---|---|---|
| 22021 | 4/18/00–5/4/00 | $ 15,000.00 | 7/24/00 | 7/25/00 [2] | 82–98 |
| 20685 | 5/4/00–5/10/00 | $ 20,000.00 | 7/31/00 | 8/3/00 | 85–91 |
| 20172 | 5/10/00 | $ 10,000.00 | 8/7/00 | 8/9/00 | 91 |
| 22123 | 5/10/00–5/11/00 | $ 10,000.00 | 8/21/00 | 8/23/00 | 104–105 |
| 22328 | 5/11/00–5/12/00 | $ 20,000.00 | 9/19/00 | 9/21/00 | 132–133 |
| 22403 | 8/7/00–8/22/00 | $286,741.98 | 9/21/00 | 9/28/00 [3] | 37–52 |
| 16 | 8/7/00 | $141,518.71 | 10/12/00 | 10/17/00 | 71 |

The first five payments were term payments. The last two payments, as well as a postpetition payment in the amount of $73,147.65, which cleared RISC's financial institution on October 23, 2000, were related to two escrow agreements between RISC and Arrow dated July 21, 2000 and August 14, 2000 respectively.

The escrow agreement dated July 21, 2000 provided the following:

> This letter will confirm our agreement with respect to *the payment of invoices issued by Gates/Arrow Distributing, Inc. ("Gates") through the placement of funds in escrow* in accordance with the terms and conditions set forth herein. This agreement is made in order to induce Gates to accept your purchase order or purchase orders and to deliver the products described therein to you so that you may, in turn, deliver products or services to your customer GENETICS IN-STITUTE ("Customer"). Gates is not a party to your agreement with Customer (which agreement, being more particularly described on Exhibit A, is hereinafter referred to as the "Customer Agreement") and will not be obligated to perform under the Customer Agree-

---

**2.** In the deposition testimony of Dorothy Sullivan, counsel to the parties set forth an agreement that check number 22021 was honored on July 26, 2000.

**3.** In the deposition testimony of Dorothy Sullivan, counsel to the parties set forth an agreement that this check was honored on September 27, 2000.

ment or otherwise incur any liability with respect to the Customer Agreement, unless such agreement is expressly incorporated into Gates's agreement with you.

*All Gates invoices shall be due and payable to accordance with the terms set forth therein.* Gates reserves the right to charge interest at a rate of 1.5% per month for all payments received beyond 30 days from the date of invoice.

*All sums payable to you pursuant to the Customer Agreement shall be delivered directly to the Treasury Department of Arrow Electronics, Inc., at the following address, which shall serve as escrow agent for the transactions contemplated by this agreement (the "Escrow Agent").*

P.O. Box 13410

Newark, NJ 07188–0410

By your signature below, *you represent and warrant that the Customer Agreement states that Customer will deliver all such payments directly to the address set forth above.* Any check or other payment instrument delivered to the Escrow Agent may be negotiated by the Escrow Agent who will hold the proceeds in an escrow account for the benefit of you and Gates (the "Escrow Fund"). The Escrow Fund may be withdrawn from escrow by written notification to the Escrow Agent signed by both you and Gates in accordance with the terms of the Agreement.

Upon Gates's delivery of the products specified in your purchase order and issuance of an invoice for such products, you agree to execute and deliver to the Escrow Agent written instructions, in the form attached hereto as Exhibit B, to pay to Gates from the Escrow Fund the amount specified on Gates's invoice. You hereby further agree to pay the Escrow Agent the fees for its services as set forth in Exhibit B. These fees may be withheld by the Escrow Agent from the Escrow Fund prior to disbursement of funds as set forth herein.

The remainder of the Escrow Fund, after payment of Gates's invoice and the Escrow Agent's fees shall be delivered to you. . . .

(emphasis supplied). Exhibit A to the Escrow Agreement contained a list of RISC purchase order numbers and corresponding numbers for Genetics Institute's purchase orders. Exhibit B to the Escrow Agreement provided the following:

Arrow Electronics, Inc.

25 Hub Drive

Melville, N.Y. 11747

Attn: Treasury Department

Re: Escrow Agreement between Gates/Arrow Distributing, Inc. ("Gates") and RISCMANAGEMENT, INC ("Reseller") for Payments to be made by GENETICS INSTITUTE OR WYETH–AYERST PHARMACEUTICALS, INC.

Dear *Ms. Leasure*

Please be advised that the proceeds in the amount of *$631,962.20* received from Customer under purchase order *013495–013493* are to be disbursed as follows:

| | |
|---|---|
| Total Received | $631962.20 |
| Reseller's proceeds | $192799.28 |
| Gates's proceeds | $438962.92 |
| Escrow Agent's Fee | $ 200.00 |

($200.00 for a single disbursement of funds or $700.00 for up to 15 disbursements of funds over a period of up to 12 months)

Proceeds are to be paid to:

Gates/Arrow Distributing, Inc. and RISCMANAGEMENT, INC. . . .

The August 14, 2000 Escrow Agreement contained identical language. Exhibit A contained a copy of Genetics Institutes'

purchase order in the amount of $70,718.00. Exhibit B, however, was not attached.

The Trustee and Arrow submitted the deposition testimony of Dorothy A. Sullivan, the credit manager for Arrow's North American Computer Products division ("NACP") and Mark S. Barron, the Vice President of RISCmanagement to support their respective positions. Ms. Sullivan testified that prior to being promoted to her present position, she was the credit manager for Moca [sic], a unit of Arrow's NACP division. According to Ms. Sullivan, Arrow did business with RISC in two ways: through term transactions and through escrow transactions. She stated that Arrow would sell either hardware or service contracts to RISC on terms, i.e., net thirty days, or through escrow agreements.

With respect to the payments made by RISC, except for the payments relating to the escrow accounts, Ms. Sullivan admitted that RISC made payments to Arrow to satisfy past due invoices and that the transfers of RISC's property were for or on account of antecedent debts owed by RISC to Arrow before the transfers were made. Deposition Transcript at 11.

Ms. Sullivan also testified about the "days sales outstanding" for the unit of the NACP division which made sales to RISC, identified as "SBM."[4] She stated that "[c]urrently they are running in the 50s to low 60s .. [but]... [i]t changes drastically from month to month." *Id.* at 18. She admitted, however, that the average number of days between the invoice date and the payment date was in the 50s to low 60s. When queried about what constituted an "ordinary transaction" for Arrow, Ms. Sullivan testified that a payment by a customer four and a half months after the

invoice date would not be considered ordinary but that a three and a half month delay was "[i]n some cases, unfortunately," ordinary. *Id.* at 35.

With respect to the escrow transactions, Ms. Sullivan described them as follows:

> Generally an escrow agreement is when a customer is either at their credit limit or there's a transaction too large that we're not comfortable looking to their net terms account, so we do a credit evaluation on the creditworthiness of the end user which would be their customer and have them [a reseller such as RISC] sign an escrow agreement....

*Id.* at 6. Ms. Sullivan added that escrow agreements employed by Arrow referenced specific purchase orders. According to Ms. Sullivan, once the end user made a payment to the escrow agent, Arrow would get the funds and would notify the reseller that the funds had arrived in the account. At that point, the reseller would "sign what we call an Exhibit B indicating what portion was theirs and what portion was ours and we would disburse the funds accordingly." *Id.* at 7.

With respect to the two escrow agreements pertinent to this adversary proceeding, Ms. Sullivan indicated that RISC, the reseller, received purchase orders from Genetics Institute, the end user, and in turn submitted purchase orders to SBM, which booked them as an escrow transaction. *Id.* at 22. She explained that contrary to customary practice with escrow agreements, "[i]n this case Genetics Institute failed to send the check to the escrow account. They mailed it directly to RISC. RISC in turn disbursed our proceeds directly to us, 'us' being Arrow." *Id.* at 23. Denying that the contemplated escrow transactions ended up working like term

---

4. Ms. Sullivan did not explain the relationship between SBM and Gates. Any distinction, however, is not material to the merits of the Trustee's Motion for Summary Judgment.

transactions, Ms. Sullivan distinguished the transactions, stating:

{The monies were still from the end user. They just did not go to the appropriate account. If you look at the Exhibit B which is, follows the two-page escrow agreement, that is the breakdown that was presented to us [Arrow] when the escrow agreement was submitted indicating how the funds were to be disbursed once received from Genetics Institute.

*Id.* at 24. In other words, according to Ms. Sullivan, the parties contemplated that Genetics Institute would send a check to Arrow in the sum of $631,962,20; RISC would be paid $192,799.28 by Arrow; and SBM would receive $438,962.92.[5] RISC, however, upon receipt of Genetics Institute's check, did not simply endorse it to the escrow agent. Rather, it deposited the end user's check into its account and issued another check to Arrow.

Ms. Sullivan confirmed what was set forth in the escrow agreements, namely that Arrow neither assumed nor incurred any obligation to Genetics Institute, although Arrow shipped products directly to Genetics Institute. *Id.* at 28. Moreover, Ms. Sullivan indicated that the escrow transactions between Arrow and RISC were limited to the two agreements dated July 21 and August 14, 2000, although Arrow employed escrow arrangements "very frequently." *Id.* at 32–34. Ms. Sullivan, however, was unable to quantify the percentages or volume of escrow transactions. She stated: "I cannot quantify it for any CP as a group. For Moca specifically that I manage which is very similar in business needs as SBM, they do the same thing only with Sun product, basical-

ly. We did 17 percent of our total business last year through escrow." *Id.* at 34.

Mr. Barron testified about his relationship with RISC, which began at the time the company was formed in 1992. He indicated that his primary responsibility was as the technical officer of the company, "identifying the products and services to market and sell." Barron Deposition at 9. He also stated that he negotiated many, if not most, of the vendor contracts. *Id.* According to Mr. Barron, "[t]he credit terms were typically net 30" with all distributors with which RISC did business. *Id.* at 11. Mr. Barron admitted, however, that in or around the year 2000, just prior to RISC's Chapter 11 filing, RISC entered into escrow agreements with several distributors other than Arrow. He named CheckPoint Software, Wescon [sic], and possibly Remedy [sic], with which RISC had, at most, one escrow agreement each. *Id.* at 13–15. Mr. Barron testified that the arrangements with CheckPoint and Wescon involved joint accounts. He also stated that end users sometimes remitted payments directly to RISC, but he could not recall whether this occurred with both CheckPoint and Wescon. *Id.* at 17. According to Mr. Barron, when RISC received direct payments, it kept its margin and forwarded the balance to the distributor. *Id.* at 18.

Mr. Barron, while admitting that he was not the person responsible for the financial aspects of RISC's business, indicated that RISC was "in a very tenuous situation" in July of 2000 because of the magnitude of its debt to its vendors and its lender. *Id.* at 22. Indeed, after reviewing the schedules submitted in conjunction with the filing of RISC's bankruptcy petition, which

---

5. RISC paid Arrow $428,260.69, $10,732.23 less than the amount set forth on Exhibit B. Other than Gates's right to charge interest at the rate of 1.5% per month for all payments

received beyond 30 days from the date of invoice, and its $200.00 charge for each disbursement of funds, the Court received no explanation for the discrepancy.

he signed, he concluded that the company was insolvent. *Id.* at 61. He testified that "there wasn't much of a change between the time . . . 90 days in that it was millions of dollars of insolvency." *Id.*

Mr. Barron also testified that when Genetics Institute approached RISC with respect to its purchase of hardware SBM was either unable or unwilling to fulfill its order on RISC's net term account because the purchase would exceed RISC's credit limit. *Id.* at 28. According to Mr. Barron, another officer of RISC, John Caianiello, negotiated an arrangement, i.e., the escrow agreement, with SBM "to mitigate the concern for the risk." *Id.* In Mr. Barron's view, SBM took the creditworthiness of the end user into consideration when it agreed to the escrow arrangement with RISC, *id.* at 30, and that it was his understanding that Genetic Institutes's creditworthiness was the only basis upon which Arrow agreed to enter into the escrow agreement. *Id.* at 32.

According to Mr. Barron, after RISC executed the escrow agreements, SBM shipped products directly to Genetics Institute. He indicated that RISC would then have billed Genetics Institute as a standard procedure. He testified that Genetics Institute was advised by the salesperson and upon invoicing to remit its payment to RISC at the post office box identified in the escrow agreements. *Id.* at 36. In other words, Genetics Institute was directed to send its check payable to RISC to the post office box identified in the agreements. *Id.* at 37.

With respect to the monies that were to be paid pursuant to the escrow agreement by Genetics Institute, Mr. Barron rejected the notion that RISC did not anticipate booking gross receipts of approximately $630,000. He said that the transaction was viewed as a normal one so that on RISC's books there would be a receivable from Genetics Institute in the sum of $630,000 with a corresponding payable to Arrow. *Id.* at 42. He testified: "our view was not that our status changed; that this was a vehicle to accommodate the concerns." *Id.* He admitted, however, that RISC did not actually anticipate a deposit in the sum of $630,000 or issuing a check to Arrow in the sum of approximately $438,000. *Id.* at 42–43. He stated:

The escrow account was, in our view, a joint account between the two of us. It was our account and it was Arrow's account, the objective being to satisfy the credit concern whereby this agreement stipulates how that money—how those proceeds are to be divided.

Instead of issuing the check to Arrow for $438,962, as would be done in the normal course of business, because we share the account, it was a transfer in our mind, in our thinking. It was still—our status as being a reseller, buying the product from Arrow and shipping it to the customer was still the way that we viewed ourselves and our role.

*Id.* at 43. He added that when RISC received the check from Genetics Institute, it forwarded the monies it owed to Arrow rather than paying other debt because "[i]t was the right thing to do." *Id.* at 46. He admitted, however, that he was not responsible for making the decision as to what bills to pay from the general account into which the Genetics Institute check was deposited. *Id.* at 47.

The Trustee also submitted the affidavit of his counsel, C. Nathan Dee, Esq. in support of his summary judgment motion. Attorney Dee stated that the Trustee is currently holding $391,396 in his bank account with respect to RISC and that the remaining assets of the estates, two pending actions to recover preferential and post-petition transfers, including this adversary proceeding, have an aggregate

maximum recovery of $630,000. Based upon his review of the cases and the claims filed in the cases, he stated that Chapter 11 administrative expenses likely will exceed $500,000; prepetition, priority unsecured claims are in excess of $2,000,000; and prepetition, non-priority unsecured claims are in excess of $6,000,000. Thus, he concluded that "it appears highly unlikely that any recovery will be available for non-priority, unsecured creditors of the Debtors."

## III.  POSITIONS OF THE PARTIES

### A.  The Trustee

The Trustee argues that the evidence establishes that he is entitled to summary judgment as a matter of law with respect to both the term and the escrow payments. At the outset, he points out that Ms. Sullivan conceded that the term payments were transfers of RISC's property to Arrow. He also argues that her deposition and the other evidence on record establishes that the term payments were made for the benefit of Arrow, a creditor of RISC; that the term payments were for or on account of antecedent debts owed by RISC before such transfers were made; that the term payments occurred while RISC was insolvent; that the term payments were made on or within 90 days of the filing of the petition; and that the term payments enabled Arrow to receive more that it would receive if the transfers had not been made and Arrow received payment of its debts under the Bankruptcy Code. See 11 U.S.C. § 547(b).

With respect to the prepetition payments relating to the escrow agreement in the total amount of $428,260.69, the Trustee states:

> [A]t no point was the intended 'escrow' created with respect to amounts paid by customers of RISC. The funds were always property of the Debtor's estate. If

RISC had not made the Escrow Payments to Arrow prior to the Petition Date, the funds would have been an asset of the estate and available for distribution to other creditors.

Specifically, the Trustee disputes Arrow's assertion in its answers to interrogatories that the payments relating to the escrow agreements were merely "passed-through" RISC and never became its property. Quoting *In re Neponset River Paper Co.,* 231 B.R. 829, 833 (1st Cir. BAP 1999), he maintains that the issue is "whether the property transferred would have been part of the bankruptcy estate had it not been transferred before the petition date" and that "the ability to exercise control over the property is sufficient to establish ownership." *See also Stingley v. AlliedSignal, Inc. (In re Libby International, Inc.),* 247 B.R. 463, 469 (8th Cir. BAP 2000).

The Trustee also argues that an escrow was never created because the monies that were to fund the escrow were transmitted by Genetic Institute directly to RISC. In short, in his view, because no funds were ever held by an independent third party, no escrow was ever created.

Because the first element of a preference is that there must be a transfer of RISC's property, the Trustee distinguishes the First Circuit's decision in *Advanced Testing Technologies, Inc. v. Desmond (In re Computer Eng'g Assocs., Inc.),* 337 F.3d 38 (1st Cir.2003). He maintains that RISC did not assign or convey property to Arrow outside the preference period as was the case in *Computer Engineering.* He also asserts that the attempted creation of the escrow account did not result in a transfer of RISC's property because a transfer occurs only when the money or property that is the subject of the escrow is actually transferred from one party to the escrow agent. He adds that, until

such a transfer, the property remains with its original owner and a creditor on a simple contract could acquire a judicial lien superior to the interest of the escrow agent.

The Trustee also maintains that *Computer Engineering* is inapposite because there was never delivery of an instrument or money to a third party and, unlike the situation in *Computer Engineering*, RISC received and commingled the proceeds of its receivables with its general funds and acquired dominion and control over them.

The Trustee argues that under 11 U.S.C. § 549 he established that the post-petition payment in the sum of $73,147.65 was a transfer of an interest of the Debtor in property and was unauthorized based upon the failed escrow argument summarized above and the timing of the payment.

Finally, the Trustee argues that he has established that he is entitled to judgment as a matter of law with respect to the affirmative defenses raised by Arrow. In particular, the Trustee asserts that Arrow failed to submit evidence of a contemporaneous exchange for new value or of subsequent new value. Additionally, he maintains that Arrow failed to establish that the payments were made in the ordinary course of business between RISC and Arrow and that the transactions at issue were within the range of credit terms normal in the industry.

### B. *Arrow*

Arrow maintains that the two prepetition payments totaling $428,260.69 were never property of RISC and were governed by the terms of the escrow agreements. It asserts, without citing any authority, that if RISC had not forwarded the escrow funds to Arrow, it could be liable for a fraudulent conversion of Arrow's property, adding that "the Genetics Institute payment is not an asset of Risc which should have been available for dis-tribution to creditors." Arrow also argues that the escrow payments are not subject to avoidance because they were made in the ordinary course of business between RISC and Arrow.

Arrow distinguishes *Libby International* on the ground that the escrow agreements between it and RISC were established, not to collect a debt, but to facilitate an order which exceeded RISC's credit limit and ability to pay within 30 days ("an escrow agreement is set up when a customer is either at their credit limit or there is a transaction too large that Arrow is not comfortable looking to the net terms of the customer, so a credit evaluation on the credit worthiness of the enduser [sic] is completed. . . ."). It argues the following:

> as a matter of law, the funds mistakenly paid to Risc in error by Genetics Institute never became property to which Risc was entitled. Rather, the property mistakenly transferred to Risc was always the property of Arrow to which Risc was never entitled. Unlike in *In Re Libby*, the Arrow escrow agreement . . . did not provide the ability of Risc to redirect funds to itself, if it so chose.

In support of its argument, Arrow relies upon *In re Estates of Pelc*, 34 B.R. 823 (Bankr.D.Or.1983). In that case, the bankruptcy court considered allegedly preferential payments arising out of the sale of the Plecs' residence to Philip and Margaret Dahl and disbursements from an escrow account from which the escrow agent paid various judgment creditors with interests in the debtors' real property. The court, in discussing the escrow agreement under Oregon law, stated:

> The escrow arrangement involved a two step process. The escrow agent is the agent of neither the Pelcs or the Dahls [sic], but occupies a unique position as the trustee of an express trust. *Foulkes*

*v. Sengstacken,* 83 Or. 118, 158 P. 952, 163 P. 311 (1917). *A consummated escrow involves two deliveries: (1) To the depositary; and (2) To the beneficiaries.* It is different than the ordinary instance of a conditional delivery to an agent for later delivery to a third party in that the agency does not terminate upon the death of a party to the escrow. *Foulkes, supra.* The relationship is governed by the terms of the escrow instructions. The requirement of Section 547(b) of the Code that a transfer of the debtors' property must have been made on or within 90 days before the date of the filing of the petition renders the transfers made to judgment creditors from the escrow pursuant to the instructions not voidable preferential transfers as the trustee asserts. *Property of the debtors, the right to receive payment from the Dahls, was transferred at the time of delivery into escrow of the note, mortgage and Satisfaction of Mortgage. The interest of the debtors after delivery was wholly dependent on the terms of the escrow. Consequently, distribution of the installment to the judgment creditors pursuant to the escrow instructions did not involve a transfer of property of the debtors.* Absent consent on the part of the Dahls the escrow instructions could not be modified and the Pelcs had a property right only to the extent so provided in the escrow instructions. No evidence of any consent to modification of the escrow instructions by the Dahls has been offered nor has any reason to consent been shown. The property transferred to the escrow by the Dahls remains their property and not that of the debtors until the terms of the escrow are met, and thus the funds in escrow never became property to which the Pelcs were entitled. *See Kelly v. Steinberg,* 148 Cal.App.2d 211, 306 P.2d 955, 959 (1957).

34 B.R. at 826–27 (emphasis added). Arrow also relies upon *Computer Engineering.* It maintains that it is factually analogous to the instant case. Moreover, it states that

> [e]ven more compelling than in Computer Associates [sic], at the time of the execution of the Escrow Agreements the debt had not yet occurred. Arrow never would have sold the product to RISC without the Escrow Agreement in effect. It was after the execution of the Escrow Agreements that Arrow shipped the product to Genetics Institute, unlike Computer Associates [sic] when there was already a substantial balance due to the subcontractor at the time of the execution of the assignment agreement.

Arrow also argues that the escrow was never made for the benefit of a creditor of RISC. In other words, relying upon the terms of the escrow agreement, it maintains that it was not a creditor of RISC. Without citation to any authority, it further argues that RISC's transfer of monies to it was not in payment of an antecedent debt owed by RISC to Arrow and that the escrow payments did not enable Arrow to receive more than it would have received under Chapter 7 if the transfers had not been made and Arrow received payment of its debt according to the provisions of the Bankruptcy Code. According to Arrow, it would be in a different class of creditors than the general unsecured creditors because, had RISC not forwarded Arrow's property to it, RISC would be liable for conversion.

Arrow also maintains that the escrow payments were made in accordance with ordinary business terms: "[t]he escrow agreements were entered into between Risc and Arrow to accommodate a substantial order of which Risc had insufficient credit to place. It was thus in the ordinary course of business between Ar-

row and Risc that an escrow agreement was set tup [sic] to accommodate this purchase." Arrow also points to Mr. Barron's testimony that RISC entered into escrow agreements with several other distributors.

Finally, Arrow argues that the Trustee is not entitled to summary judgment with respect to the postpetition payment. Making the same arguments it made about the prepetition payments, it maintains that the postpetition payment was not a transfer of property of RISC.

## IV. SUMMARY JUDGMENT STANDARD

The Trustee is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c), made applicable to this proceeding by Fed. R. Bankr.P. 7056. In *In re American Spring Bed Mfg. Co.*, 153 B.R. 365, 371 (Bankr. D.Mass.1993), this Court elaborated on the standards as follows:

> The burden of proof is on the moving party to demonstrate the lack of a genuine issue of material fact. The moving party bears the "initial responsibility" of asserting the basis for this motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the movant is not required to negate his opponent's claim with affidavits or similar materials. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. The movant may discharge his burden by merely "showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

In order to defeat any motion for summary judgment, the opposing party must produce substantial evidence of a genuine dispute as to a material fact. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). "A material issue is one which affects the outcome of the litigation. To be considered 'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id.* quoting, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). *See also Tavares v. Sprunk (In re Tavares)*, 298 B.R. 195, 201–202 (Bankr. D.Mass.2003).

## V. DISCUSSION

A. *Did RISC have a property interest in the monies intended to fund the escrow?*

1. Applicable Law

■ The legal principles applicable to complaints to avoid and recover preferential transfers are well established. In *Computer Engineering*, the United States Court of Appeals for the First Circuit set forth these general principles as follows:

> [A] Chapter 7 trustee, subject to the defenses set out in subsection 547(c), "may avoid any transfer of an interest of the debtor in property" made (1) to a creditor, (2) on account of an antecedent debt, (3) while the debtor was insolvent, (4) during the 90–day period preceding the filing of the petition, which (5) allowed such creditor to receive more than it would have under Chapter 7. 11 U.S.C. § 547(b). A transfer of the debtor's property is perfected for subsection 547(b) purposes "when a creditor on a

simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." *Id.* § 547(e)(1)(B). The determination of whether a judicial lien is superior to the interests of the transferee is governed by state law. *In re Battery One–Stop Ltd.,* 36 F.3d 493, 495 (6th Cir.1994). The burden is on the trustee to prove each of these elements, and the failure to do so will defeat its preference claim. 11 U.S.C. § 547(g). 337 F.3d 38, at 45. In this case, as in *Computer Engineering,* the Trustee's ability to avoid the alleged preferences depends upon whether RISC had interests in the property which was transferred to Arrow.

Because the parties discuss the *Computer Engineering* decision at length, it is important to set forth the facts of that case in some detail. Moreover, in view of the parties' attempted use of an escrow, the Court shall examine other cases in which the parties used or attempted to use escrow agreements.

Computer Engineering Associates, Inc. ("CEA") was a Massachusetts corporation engaged in hardware and software support and enhancement of computer systems. It had an open-ended contract with the United States Air Force to provide engineering services for which it was to receive a fixed price of over two million dollars. 337 F.3d at 40. Because it was unable to complete the delivery orders issued under its open-ended contract with the Air Force without access to certain proprietary technology owned by Advanced Testing Technologies, Inc. ("ATTI"), CEA subcontracted work under the delivery orders to ATTI for a fixed price, which was 20% less than what the government had agreed to pay it. *Id.* In addition to performing the work under the delivery orders, ATTI also prepared monthly reports, which the Air Force required under the contract. In addition to the monthly reports, the Air Force also required the submission of requests for partial payment. *Id.* at 41. CEA's subcontract with ATTI's required it make payments to ATTI within ten days of its receipt of partial payments from the Air Force. *Id.*

In 1995, CEA's financial condition deteriorated and, although it was receiving payments from the government for work performed by ATTI pursuant to the delivery orders, it ceased paying ATTI and other creditors, as well as its employees and various taxing authorities. Additionally, CEA assigned its receivables under the Air Force contract to its secured lender, all the while making excuses to ATTI for nonpayment of its obligations under the subcontract. *Id.* At this point in the relationship between CEA and ATTI, CEA could not complete the delivery orders without ATTI, and ATTI was refusing further performance without a guaranty of payment. ATTI thus proposed an arrangement which would provide CEA with a loan from its lender, State Bank of Long Island ("SBLI"), in an amount equal to CEA's 20% portion of the delivery orders and would insure that it would be paid through the assignment of the Air Force contract receivables to SBLI, which, in turn, would disburse ATTI's portion and retain CEA's portion as payment of the outstanding loan. *Id.* at 42.

Having no choice but to accept ATTI's proposal, CEA, outside the preference period, agreed to (1) assign all proceeds under the Air Force contract to SBLI pursuant to the federal Assignment of Claims Act, *see* 31 U.S.C. § 3727 and 41 U.S.C. § 15, (2) establish a joint checking account with ATTI at SBLI, into which SBLI would deposit the contract proceeds and from which ATTI and CEA debtor could withdraw their respective shares on joint checks, (3) apply for a loan from SBLI for

$10,000, and (4) not prepay the $10,000 loan. *Id.* at 43. Moreover, CEA and ATTI agreed that ATTI would prepare invoices and requests for payment and would have full access to CEA's internal record-keeping systems through which it could monitor CEA's invoices as processed by the government. Additionally, the parties agreed that ATTI would be paid from the first available proceeds held in the joint account established at SBLI, *id.,* and that ATTI would have a power of attorney to submit invoices to the Air Force without CEA's approval and to sign checks on behalf of CEA in the event it filed a bankruptcy petition. *Id.* at 43 n. 7. The assignment specifically provided that it was irrevocable until the contract was completed. The United States Air Force accepted the assignment outside the preference period.

In accordance with the parties' agreements, SBLI deposited approximately $1,450,000 into the joint account, representing the sums paid by the Air Force under the delivery orders, and the parties withdrew their respective shares during the preference period. *Id.* Despite ATTI's "stopgap measure," CEA filed a Chapter 11 petition. Unable to reorganize, CEA converted its case to a case under Chapter 7. The trustee then sought to avoid the payment of over $1,200,000 to ATTI during the preference period on the ground that the assignment was to SBLI, not to ATTI, and that CEA had retained all right, title and interest to any amounts in excess of that necessary to discharge its indebtedness to SBLI. *Id.* at 44. ATTI, according to the First Circuit, denied liability on the ground that there was an absolute assignment to it, and SBLI was only a conduit for purposes of the Assignment of Claims Act. ATTI also asserted that "[b]ecause the assignment occurred outside the preference period, the proceeds never became part of CEA's estate." *Id.*

According to the First Circuit, "[t]he parties focus[ed] exclusively on whether the transfer to ATTI was perfected at the time of the assignment, which occurred outside the preference period." *Id.* at 45. The court stated the following:

> To be an effective assignment, the assignor *must divest itself of all right, interest, and control in the property assigned.* Any act or words that show an intention to transfer all interests to the assignee are sufficient for a valid assignment; in other words, no specific or magic words are necessary for its formation. Partial assignments—i.e., an assignment of only part of a larger interest in property (e.g., assignment of 80% of accounts receivables)—are valid and enforceable. As the trustee points out, however, a mere promise to pay a debt out of a designated fund does not operate as an effective assignment where the assignor continues to control the fund; retention of control precludes the perfection of an assignment. Accordingly, our analysis centers on the parties' intent in entering the June 1995 transactions and whether and to what extent CEA retained control over the Contract proceeds.

*Id.* at 46 (citations omitted, footnotes omitted, emphasis supplied). Concluding that ATTI's agreement was structured "*to divest* CEA of its ability to obtain the proceeds of the Contract and use them for its own benefit without first paying sums due and owing ATTI under the subcontract," the First Circuit determined that CEA relinquished all control over the proceeds by, among other things, irrevocably assigning the contract proceeds to SBLI, establishing the joint bank account, transferring to ATTI responsibility for invoices and requests for payments, and providing ATTI with full access to its internal systems. *Id.* at 47.

In another case involving the federal Assignment of Claims Act, *Holmes Envtl., Inc. v. Suntrust Banks, Inc. (In re Holmes Envtl., Inc.),* 287 B.R. 363 (Bankr.E.D.Va. 2002), the court considered an escrow agreement, which the debtor sought to reject as an executory contract, pursuant to which the parties, the debtor, Holmes Environmental, Inc. ("Holmes"), and its subcontractor, Hazmed, Inc. ("Hazmed"), contemplated setting aside monies earned by Hazmed, as a direct result of Hazmed's labors on a contract with the Army Corps of Engineers (the "Corps"). Additionally, the court considered Holmes's complaint in which it alleged that Hazmed received a preference because the instrument of assignment pursuant to the Assignment of Claims Act (through which Holmes assigned to Suntrust Banks ("Suntrust") for deposit into escrow its payments under its contract with the Corps and from which Hazmed was to be paid) was not executed until after the commencement of the preference period. Indeed, the Corps did not remit payment to Suntrust until after the filing of the petition. Holmes maintained that execution of the instrument of assignment was a transfer of an interest in property within 90 days of the filing date.

Although the parties disputed the date when the instrument of assignment was executed, they did not dispute that they executed a subcontract and escrow agreement outside the preference period. The subcontract and escrow agreement recited that Holmes had assigned to an escrow agent certain payments to be made by the Corps for the purposes of facilitating payments to Hazmed. Hazmed insisted on the escrow agreement because its investigation of Holmes's finances revealed that it did not have "substantial economic strength." 287 B.R. at 369.

According to the bankruptcy court, after execution of the escrow agreement, Hazmed commenced work on the Corps contract and Holmes submitted invoices to the Corps for payment. Hazmed would prepare the invoices and forward them to Holmes, which would add the hours worked by its personnel. All of the monies from the invoices were sent directly to Holmes and the escrow established at Suntrust was not funded. Thus, Holmes initially received the contract proceeds and failed to pay Hazmed. *Id.* at 371. After the commencement of the bankruptcy case, however, the Corps made a disbursement of monies to Suntrust which Suntrust deposited into the escrow established by the escrow agreement. *Id.* at 372.

The court found that the instrument of assignment was executed on October 8, 2001, within the preference period, not March 23, 2001 as Holmes contended. *Id.* at 373. According to the Virginia bankruptcy court, however, that factual finding was not dispositive. It stated:

It remains ... to determine what legal import, if any, this factual conclusion has in determining whether (1) a preferential transfer or postpetition transfer has occurred which are voidable; (2) whether the proceeds of the Corps Contract now held by Suntrust, or any portion thereof, is property of the estate of Holmes pursuant to 11 U.S.C. § 541; and (3) is the Escrow Agreement an executory contract pursuant to 11 U.S.C. § 365 which Holmes may reject.

*Id.* at 373.

The court began its analysis with § 541 of the Bankruptcy Code and the law of trusts, observing that "escrow agreements are, in fact, a type of express trust." *Id.* at 375 (citing *Old Republic Nat. Title Ins. Co. v. Tyler (In re Dameron),* 155 F.3d 718, 723 (4th Cir.1998)). The court added:

Some courts have found that, in determining whether an escrow account is part of the debtor's estate, the nature

and circumstances of the escrow agreement control. *O'Neil v. Shipman (In re Pratt and Whitney, Inc.)*, 143 B.R. 19, 22 (Bankr.D.Conn.1992). Factors that courts have found relevant "in this determination include, but are not limited to whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it, the nature of the funs [sic] put into it, the recipient of its remainder (if any), the target of all its benefit, and the purpose of its creation.'" *Id.*, (citing *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 567 (Bankr.N.D.Iowa 1990)). In analyzing escrow arrangements, courts have recognized that escrow agreements are distinguished from mere contracts:

> [A]n escrow is something more than a contract-it is a method of conveying property. When property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement.

*Anderson County Bank v. Newton (In re All Chemical Isotope Enrichment, Inc.)*, 127 B.R. 829, 838 (Bankr. E.D.Tenn.1991), (citing *Carlson v. Farmers Home Administration (In re Newcomb)*, 744 F.2d 621, 624 (8th Cir. 1984)).

As one court has observed, "[f]unds held in escrow or trust present difficult property of the estate questions for courts." *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 566 (Bankr.N.D.Iowa 1990). Cases have divided on the question of whether escrow funds are property of the estate. *Id.* However, "in cases where the agreement acted as an assurance or guarantee fund, courts have found that the escrow funds are not property of the estate." *Id. See, e.g., In re Dolphin*

*Titan*, 93 B.R. 508, 511–12 (Bankr. S.D.Tex.1988) (monies placed in an escrow fund to assure payment of worker's compensation claims was not estate property); *In re Palm Beach Hgts. Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D.Fla.1985) (monies placed by debtor in an escrow fund to guarantee the debtor would complete certain drainage and road improvement work was not property of the bankrupt estate).

The reasoning for such a conclusion has been succinctly summarized: "[f]or the court to release the fund to the Debtor would be contrary to the agreement between debtor and [the creditor], and convert Debtor's contingent right [to the fund] into a non-contingent right." *Dolphin Titan*, 93 B.R. at 512, (citing *In re Creative Data Forms, Inc.*, 41 B.R. 334, (Bankr.E.D.Pa.1984)).

*Holmes Environmental*, 287 B.R. at 375–76. Thus, the bankruptcy court, recognizing that no mechanism existed to pay Hazmed directly, except in accordance with the Assignment of Claims Act, determined that the issues were whether there was a sufficient manifestation of the debtor's intention to place the portion of the Corps contract earned directly by Hazmed beyond its control in March when it executed the escrow and subcontract agreements or in October when the instrument of assignment was executed. *Id.* at 377.

As in *Computer Engineering*, the court found that the parties, in executing the subcontract and escrow agreement outside the preference period, contemplated the setting aside of the monies earned by Hazmed. Referring to the law of trusts, both express and constructive, it stated:

> After submission of its invoice for work performed by it on the Corps Contract to Holmes, Hazmed would forward a copy of the invoice to Suntrust as escrow

agent. Holmes was to invoice the Corps and provide payment instructions to Suntrust. Suntrust was charged with deposit of all payments received from the Corps Contract into a non-interest bearing account. Upon receipt of proceeds from the Corps, Suntrust would compare the payment instructions received from Hazmed. Suntrust would pay the amount due Hazmed unless a discrepancy existed between the payment instructions and the Hazmed invoices. Any remaining amounts in the account would then be paid to Holmes. While the Escrow Agreement does not use the terms "trust" or "in trust," it contemplates that the portion of the contract proceeds earned directly from Hazmed's labors would be paid to a third party, set aside, segregated and disbursed directly by the third party to Hazmed. Holmes would have no interest in the segregated funds except a reversionary interest in the monies not earned by Hazmed. These provisions, in combination with the references in the Escrow Agreement to the making of the Subcontract and the Instrument of Assignment, are sufficient under Virginia law to establish an express trust of the monies earned under the Corps Contract by the efforts of Hazmed. The intention to place these monies beyond the control of Holmes appears plain. 287 B.R. at 377–78.

Despite the language employed in the escrow agreement, Holmes continued to argue that no trust could be formed under applicable law unless and until the instrument of assignment was executed and monies actually transferred into the escrow account. *Id.* at 378. The bankruptcy court recognized that "many cases stand for the proposition that in order to create a trust *inter vivos* in which the trustee is other than the settlor, the settlor ordinarily must make an *inter vivos* transfer of the trust property to the trustee." *Id.*[6] The court concluded that

> [T]he present intention of Holmes to create a trust in the proceeds of the Corps Contract was sufficient to find an express trust was created at the execution of the Subcontract and the Escrow Agreement. Circumstances here leave little doubt that the creation of the trust with Suntrust was well supported by consideration. The evidence is not disputed that this payment arrangement

6. The court utilized the following analysis:
The court also considered enforceable and nonbinding promises as to the timing of when a trust arises:

Where a property owner makes a nonbinding promise to create a trust in the future, no trust is thereby created. If the property owner later establishes the trust by inter vivos or testamentary transfer or by declaration, the trust is created by the transfer or declaration (see Comments d and e) and not by the promise. Similarly, when a property owner makes a contractually binding promise to establish a trust by inter vivos or testamentary transfer or by declaration and later performs by making the promised transfer or declaration, ordinarily the trust is created at the time of performance, whether the transfer or declaration is made voluntarily or involuntarily.

In this situation the trust and the trustee's fiduciary duties ordinarily come into existence at the time of the settlor's performance and not at the time the binding promise is made.

If, however, a person make [sic] or causes to be made an enforceable promise to pay money or transfer property to another as trustee, and if the person (with the expressed or implied acceptance of the intended trustee) also manifests an intention immediately to create a trust of the promisee's rights, a trust is created at the time of the contract, with a chose in action (the rights under that contract) then being held for the beneficiaries by the trustee.

287 B.R. at 379 (citing Restatement (Third) of Trusts, cmt § 10 (Tentative Draft No. 1 (1996))).

was the sine qua non of the relationship of Hazmed with Holmes."

*Id.* at 379. The court added: "[t]he testimony of Ms. Sales makes it plain that Hazmed would not have entered into the Subcontract and performed the work thereon unless Holmes had made its promise to create the trust and escrow to ensure Hazmed would be paid for its work performed." *Id.* (footnote omitted). Determining that compliance with the Assignment of Claims Act was unnecessary to create a trust, the court stated that "[w]hile the Instrument of Transfer was necessary to protect the Corps under the Assignment Act and to induce it to pay Suntrust, it was not necessary to create the trust established by the Escrow Agreement. Rather, the intent to set aside the monies earned by Hazmed is adequately displayed in these earlier documents." *Id.* at 380. In sum, the court found that no transfer occurred within the preference period as the trust was created well before the preference period commenced. The court determined that the fact that the escrow was not funded until after the filing of the bankruptcy petition did not change the result, distinguishing *Hooker Atlanta Corp. v. Hocker (In re Hooker Inv., Inc.)*, 155 B.R. 332 (Bankr. S.D.N.Y.1993), in which the court concluded that an irrevocable transfer occurred when the monies in question were placed into escrow.[7] In reaching its decision that there was no avoidable transfer that deprived the debtor's estate of something of value, the court cited *Carlson v. Farmers*

*Home Administration (In re Newcomb)*, 744 F.2d 621 (8th Cir.1984).

In *Newcomb*, the United States Court of Appeals for the Eighth Circuit considered an escrow agreement in which Newcomb, the debtor, placed money to satisfy a judgment in escrow, and the United States agreed not to levy on the judgment. The escrow agreement further provided that, if the appeals court affirmed the judgment in favor of the government, the escrow agent would turn over the money plus interest to the United States, and, if the appeals court reversed, the escrow agent would turn the money over to Newcomb. Approximately one month before Newcomb filed its bankruptcy petition, the appeals court affirmed the judgment. Because the escrow agent did not turn the money over to the government, the trustee filed a complaint for turnover.

The government argued that the relevant transfer occurred either when the original judgment for the United States entered or when the parties executed the escrow agreement, both of which occurred outside the preference period. The United States Court of Appeals for the Eighth Circuit accepted the latter argument and determined that the relevant transfer occurred when the parties entered into the escrow agreement and funds were turned over to the escrow agent. Noting that "[t]he issue of what interests in escrowed property are transferred at what point in time is a complex issue under Missouri law," *id.* at 625–26, the Eighth Circuit, referring to the definition of transfer set forth in the Bankruptcy Code,[8] stated:

7. The court stated that in *Hooker* the issue was whether the debtor retained control of an escrow created directly from its funds, while Holmes created an express trust from monies to be paid in the future from the Corps. *Id.* at 380.

8. Under the Bankruptcy Code, "transfer" is defined broadly:

> "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest.
> 11 U.S.C. § 101(40).

This definition is broad enough to include both the transfer that occurs when an escrow is created and the transfer that occurs when the condition of an escrow is met. Thus the issue becomes which of these two "transfers" is controlling in this case. In analyzing this issue, we look to the real substance of the interests transferred, not to whether those interests are referred to as "legal title" or "equitable interest."

When the escrow involved in this case was created the interest transferred to the FHA [the government] was a contingent right to the escrowed funds, that is, a right to the funds if this court affirmed the judgment for the United States. The interest left in Newcomb by this transfer was a contingent right to the funds if this court reversed the judgment for the United States. Because this transfer was made more than 90 days before the petition for bankruptcy, it cannot be avoided.

Given the unavoidable transfer that occurred when the escrow was created, the transfer that occurred when the condition of the escrow was met is not the type of transfer that can be avoided. To be avoidable a transfer must deprive the debtor's estate of something of value which could otherwise be used to satisfy creditors. 4 Collier on Bankruptcy ¶ ¶ 547.08[2], .20, .21 (15th ed.1984). Once the escrow was created, the only interest in the escrowed funds remaining in the debtor was a contingent right to the funds if this court reversed the judgment for the United States. This interest is worthless in light of this court's affirmance of the judgment for the United States. Therefore, the "transfer" of this interest did not deprive the estate of anything of value. It follows that this "transfer" cannot be avoided.

The trustee has argued that the relevant transfer will occur only when the escrowed funds are physically turned over from the escrow agent to the United States. The trustee argues that this transfer can be avoided as a post-petition transfer under § 549. Obviously, this turnover will constitute a physical transfer of the funds from the escrow agent to the United States. However, all interest in the escrowed funds was transferred to the United States when the condition of the escrow was met. *See generally*, 28 Am.Jur.2d Escrow § 10 (1966); 30A C.J.S. Escrows § 10(a) (1965); Annot., 15 A.L.R.2d 870[, 1951 WL 7276] (1951). Therefore, the physical transfer from the escrow agent to the United States will not be a transfer of "property of the estate," as is required for an avoidable post-petition transfer under § 549.

As the above analysis shows, the relevant transfer occurred when the escrow agreement was entered into and the funds turned over to the escrow agent. Any prior transfer of a judgment lien is irrelevant to the trustee's complaint for turnover of the escrowed funds. At the creation of the escrow there was an unavoidable transfer which left the debtor with only a contingent right to the escrowed funds if this court reversed the judgment for the United States. In light of this unavoidable transfer, the transfer that occurred when the condition of the escrow was met is not avoidable because it did not deprive the debtor's estate of anything of value. The pending physical transfer cannot be avoided because it is not a transfer of "property of the estate." Because the relevant transfer occurred more than 90 days prior to the petition for bankruptcy, the trustee is not entitled to turnover of the escrowed funds. Rather, the FHA is entitled to the funds under the terms of the escrow agreement.

744 F.2d at 626–27 (footnote omitted) *See also In re Knox Kreations, Inc.*, 656 F.2d 230 (6th Cir.1981); *Musso v. New York State Higher Ed. Services Corp. (In re Royal Business School)*, 157 B.R. 932, (Bankr.E.D.N.Y.1993).[9]

In addition to the cases discussed above, both the Trustee and Arrow cite *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463 (8th Cir. BAP 2000). In that case, the debtor, Libby International, Inc. ("Libby"), a government contractor, owed its subcontractor, Allied-Signal, Inc., over eight million dollars. Because of the magnitude of the debt and to facilitate payment, the parties established an escrow account. Outside the preference period, Libby submitted a form to the Air Force to have its contract payments deposited directly to the escrow account. As a result of an accounting error, a large check was sent directly to Libby, which deposited it into the escrow account in accordance with the parties' agreement. Libby made the deposit outside the preference period. During the preference period, AlliedSignal received a deposit in the sum of approximately $57,000 from the Air Force as well as two additional deposits for a total of approximately $325,000, although it was still owed over $10 million when Libby filed its bankruptcy petition. 247 B.R. at 465. Because of Libby's defaults, AlliedSignal advised the escrow agent to send it the funds in the escrow account. When the trustee sued Allied-Signal to recover alleged preferential transfers, AlliedSignal defended on the grounds that the earmarking doctrine precluded recovery. The bankruptcy court determined that the doctrine did not apply to prevent the trustee from avoiding the preferential transfers, and the bankruptcy appellate panel affirmed.

As in *Computer Engineering* and *Holmes Environmental,* the Bankruptcy Appellate Panel for the Eighth Circuit determined that the issue was "whether there was a transfer of an interest of the debtor." *Id.* at 466. Observing that the Bankruptcy Code does not define "property of the debtor," the court noted that the Supreme Court has indicated that for purposes of § 547(b), it is "best understood as the property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." *Id.* (citing *Begier v. Internal Revenue Service,* 496 U.S. 53, 110

<hr />

**9.** In *Royal Business School,* the court observed:

> In New York, as in most other states, legal title to property placed in escrow remains with the grantor pending the fulfillment of the conditions agreed upon in the escrow agreement. However, the deposit of property placed in escrow creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, although pending full performance of the conditions, the legal title remains in the grantor and is subject to ... the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement is subject to the equity of the grantee.

> Moreover, in order for an escrow to be valid, the transfer must be irrevocable. Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, the property must be beyond the possession and control of the grantor while it is in the hands of the escrow agent. Thus, when considering preference actions, the predominant rule is that a subsequent judgment or release of escrow monies does not deprive the estate of anything of value since the debtor reserves only a contingent right to the escrowed funds.

> For these reasons, most courts considering the issue under New York law have held that escrow accounts are not property which would vest in the trustee in bankruptcy.

157 B.R. at 940–41.

S.Ct. 2258, 110 L.Ed.2d 46 (1990)). Citing *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 133 (Bankr.D.Mass.1989), the bankruptcy court discussed the earmarking doctrine,[10] but concluded:

> The facts in this case present a classic preference.... Libby owed a large debt and was not timely making payments to AlliedSignal, prompting the creditor to institute measures to ensure collection. These actions are precisely of the type the preference provisions are meant to reverse in order to promote equality of treatment among the unsecured creditors. The parties agreed that an income source of the debtor would be directed through a bank to AlliedSignal, rather than through Libby. *For preference purposes, the only alteration that was made to the agreement between the parties was a change in the address to which one of the debtor's sources of income was to send its checks.* There was no substitution of creditors nor any other change that would affect the analysis with regard to property of the estate. Before the address change, Libby owed $8,000,000 to AlliedSignal and, theoretically at least, periodically sent its payments on the debt when it received its payments from the U.S. Air Force. After the address change, Libby owed $8,000,000 to AlliedSignal but the U.S. Air Force was directed to send checks directly to an escrow account for ultimate payment to AlliedSignal. *Before the address change, Libby was entitled to receive funds from the U.S. Air Force and it was, under its agreement with AlliedSignal, obligated to make payments on its debt to AlliedSignal. After the address change, Libby was still entitled to payments from the U.S. Air Force but entered into agreements for the funds to be sent directly to AlliedSignal. Libby's property interest is the same under either scenario.*

> In this case, ... [t]here is only one creditor which altered its original payment terms with a defaulting debtor so that it would begin receiving funds the debtor's income source, through a bank escrow agreement, rather than directly from the debtor. The receipt of those funds depleted the assets of the estate in the same manner as if Libby had received the funds from the U.S. Air Force and transmitted them to AlliedSignal itself. Earmarking has no application in this situation.

247 B.R. at 467–68 (emphasis supplied).

2. Analysis

The Court finds that the facts of the instant case are plainly distinguishable from the facts set forth in *Computer Engineering, Holmes Environmental, Newcomb*, as well as *In re Pelc*, 34 B.R. 823 (Bankr.D.Or.1983), the case cited by Ar-

---

**10.** The court described the earmarking doctrine, which Arrow did not raise as a defense, as follows:

> The earmarking doctrine is based upon the element of proof that requires that an interest of the debtor be transferred in order for a preference to occur. The doctrine was originally based upon the rationale that since the funds were provided by a third party for the specific purpose of paying a selected creditor, the debtor had no actual control over disbursement. Thus, because the estate was not diminished by the pay-

ment, the payee should not be required to return the funds. If the result of the transaction is merely to substitute one creditor for another, the estate is not diminished....

> AlliedSignal urges that the doctrine be applied here because the funds were entrusted to another, the bank, with instructions under a specific agreement to pay the debtor's obligation on a particular antecedent debt ....

247 B.R. at 467.

row. In *Computer Engineering,* and *Holmes Environmental,* in particular, the courts found that the debtors irrevocably assigned all their right, title and interest in monies owed to them from the government *outside the preference period* by way of irrevocable assignments, coupled with escrow agreements and assignments under the Assignment of Claims Act. In each of these decisions, the courts found that the debtors intended to divest themselves of interests in property through execution of escrow agreements and that they intended to relinquish control over the escrowed money or property. Viewing the transactions involved in the above cases as creating trusts between the parties, it is evident that the debtors manifested an intention to set aside a particular fund, a *res,* for the benefit of the defendants and that the bankruptcy estates were not diminished by the payments to the defendants within the preference period or postpetition.

In the instant case, the Court finds that escrow agreements contemplated by the parties failed to accomplish their intended purpose of guaranteeing Arrow payment of its invoices and that RISC's bankruptcy estate was diminished by the payments to Arrow. Moreover, unlike the situations in *Computer Engineering* and *Newcomb* in which the courts found that the debtors intended to transfer intangible rights, this Court finds that the unambiguous language utilized by the parties set forth their intention to fund an escrow with money to be paid to the escrow agent by Genetics Institute, not an intention on the part of RISC to make a present conveyance of its intangible right to receive future payments from Genetics Institute. More importantly, the instant case is further distinguishable from *Computer Engineering, Holmes Environmental,* and *Newcomb* in that the escrow agreements were executed within the preference period, the escrows were never funded, and RISC exercised control over the funds owed to it by Genetics Institute. Significantly, Mr. Baron testified that RISC viewed the transaction with Genetics Institute like any other to the extent it booked a receivable in the full amount of its purchase order from the Genetics Institute. Additionally, Ms. Sullivan testified that Arrow assumed absolutely no responsibility for the performance of the contract between RISC and Genetics Institute. Thus, the facts of this case square more readily with those in *Libby International* than the facts discussed in *Computer Engineering, Holmes Environmental* and *Newcomb.*

The Court finds that the intention of the parties to create an escrow has little bearing on the outcome of the case as the escrow was never funded and its conditions were never satisfied. When Genetics Institute paid RISC, RISC endorsed its checks and commingled the funds in its general accounts. It then paid Arrow the sums due it. Accordingly, the elements required for creation of an escrow in accordance with Massachusetts law were not satisfied.

In *Aranha v. Eagle Fund (In re Thornhill Global Deposit Fund, Ltd.),* 245 B.R. 1 (Bankr.D.Mass.2000), *aff'd, Mercurius Inv. Holding, Ltd. v. Aranha,* 247 F.3d 328 (1st Cir.2001), the bankruptcy court considered whether an escrow had been created through an exchange of correspondence. It observed that "[i]n Massachusetts, the term 'escrow' can be used with respect to written instruments as well as to deposits of money." *Id.* at 12. Citing *Childs v. Harbor Lounge of Lynn. Inc.,* 357 Mass. 33, 35, 255 N.E.2d 606 (1970), and *Kaarela v. Birkhead,* 33 Mass.App.Ct. 410, 412–13, 600 N.E.2d 608 (1992), the bankruptcy court added:

The sparse Massachusetts case law thus defines a deposit in escrow to mean 'to

deliver it to a third party to be held until the performance of a condition or the happening of a certain event.' *Childs,* 357 Mass. at 35, 255 N.E.2d 606. The third party escrow agent becomes the fiduciary of both the depositor and the grantee; she can not remain the agent of either in regards to the deposited funds. *See Birkhead,* 33 Mass.App.Ct. at 412–13, 600 N.E.2d 608. The escrow agent has a duty to keep the deposit and can not dispose of it except pursuant to the terms of the underlying agreement. *See id.*

Consistent with this definition, other states have defined an escrow more precisely to mean "a written instrument imparting a legal obligation, that one party to a transaction (i.e., a grantor, promisor, or obligor) deposits with a third party, the escrow agent, for the escrow agent to hold until the performance of a condition or occurrence of an event, and then to deliver to the other party to the transaction (i.e., grantee, promisee, or obligee)." *Johnson v. Exclusive Properties Unlimited,* 720 A.2d 568, 572 (Me.1998) citing Black's Law Dictionary 641 (4th ed.1951). The creation of an escrow thus requires four elements: (1) an agreement regarding the subject matter and delivery of the deposit or instrument; (2) an escrow agent; (3) delivery of the funds or in-strument to the agent, conditioned on the performance of an act or occurrence of an event; and (4) relinquishment of the funds by the grantor or depositor. *Id.*

*Thornhill Global Deposit Fund, Ltd.,* 245 B.R. at 12.[11]

In the present case, the requisite elements for the creation of an escrow were not satisfied, and the parties did not execute any other documents that would indicate an intention on the part of RISC at the time of the execution of the escrow agreements to divest itself of control over its receivables from Genetics Institute. RISC and Arrow entered into two agreements on July 21, 2000 and August 14, 2000. Pursuant to these agreements, the parties agreed to create escrow accounts in the future, i.e., after the goods were delivered to Genetics Institute and after RISC issued invoices to Genetics Institute. The delivery of the goods thus created an obligation on the part of RISC to Arrow. Like the situation in *Libby International,* Genetics Institute issued checks payable to RISC which enabled RISC to deposit them in its general accounts. Thus, the escrow accounts were never funded. Even if RISC had intended to relinquish control over the funds owed to it by Genetics Institute, RISC, through no action on its part, obtained possession and control over the funds which it could and did deposit

11. In affirming the bankruptcy court and district court, the United States Court of Appeals for the First Circuit stated:

> Under Massachusetts law, which controls here, "[t]o deposit a sum in escrow is simply to deliver it to a third party to be held until the performance of a condition or the happening of a certain event." *Childs v. Harbor Lounge of Lynn, Inc.,* 357 Mass. 33, 255 N.E.2d 606, 608 (1970); *see also* Black's Law Dictionary 565 (7th ed.1999) (defining escrow as "[t]he general arrangement under which ... property is delivered to a third person until the occurrence of a condition"). An escrow agreement need not be embodied in a formal contract and may be inferred from an exchange of letters. *See, e.g., Kaarela v. Birkhead,* 33 Mass.App.Ct. 410, 600 N.E.2d 608, 609–10 (1992). Moreover, while cases often speak of funds in escrow as being held by a third party, one party's counsel may act as an escrow holder so long as the parties agree that in this capacity counsel is to serve not as "the agent of either of the parties," but as "a fiduciary of both of them." *Id.* at 610.

247 F.3d at 331.

into its general accounts. Had it not promptly paid Arrow, one of its other creditors could have obtained an attachment by trustee process against one or more of its accounts, including the accounts into which it deposited the funds from Genetics Institute. *See generally,* Mass. R. Civ. P. 4.2.

■ In addition to the control RISC had over its general accounts into which it deposited Genetic Institute's checks, RISC's bankruptcy estate was diminished by the payments to Arrow. Arrow asserts that RISC would have been liable to it for conversion, rather than for breach of contract, if RISC had failed to remit payments pursuant to the purchase orders for the products which Arrow shipped directly to Genetics Institute. Its argument, however, is unpersuasive, particularly as it is tantamount to an admission that RISC had control over the funds.[12] Whether RISC would have been liable for conversion or breach of contract is irrelevant because another creditor that had extended credit to RISC could have obtained a judicial lien against RISC's accounts that would have prevented RISC from repaying Arrow. In other words another creditor, or the trustee of the Debtors, could have obtained an interest superior to that of Arrow in the funds. *Id. See also* 11 U.S.C. § 544.

Significantly, RISC did not execute an assignment of its right, title and interest in the Genetics Institute receivables to Arrow. Rather, it executed two contracts, the escrow agreements, in which it represented and warranted that its contracts with Genetics Institute would contain pro-

visions that Genetics Institute would deliver payments directly to a specific address. The escrow agreements specifically provided that Arrow was not a party to RISC's agreements with Genetics Institute and was not obligated to perform under the contracts or incur any liability to Genetics Institute. Unlike the circumstances in *Computer Engineering,* RISC did not execute multiple documents, such as an assignment agreement, Corporate Resolution and Banking Agreement, Assignment of Deposit Account, Indemnity Agreement, note, security agreement or power of attorney, all of which were executed by the debtor in *Computer Engineering.* Moreover, RISC did not allow Arrow access to its internal records.

The deposit of monies into RISC's general account as a result of Genetics Institute's failure to abide by RISC's instructions is determinative. The terms of the escrow agreements indicate that the parties intended to create escrow accounts in the future, which were to be funded by payments from Genetics Institute and that, once funded, the monies would be distributed in accordance with instructions set forth on Exhibit B to the escrow agreements. Because the escrow accounts were never funded (there was no trust *res*), the transfer of property of the debtor for purposes of § 547(b) must be the payments made by RISC to Arrow from its general accounts. The plain language of the escrow agreements did not provide for a present assignment or transfer of RISC's right to receive funds. Rather,

---

**12.** In Massachusetts, to prevail on a conversion claim a plaintiff must show the following:

    (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conver-

sion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 95 (1st Cir.1993).

590

they provide that RISC was representing and warranting that Genetics Institute would deliver payment to the Escrow Agent in accordance with its agreement with Genetics Institute. In summary, as in *Libby International*, the only change was a change of address to which one of RISC's customers, Genetics Institute, was to make its payments. As Mr. Barron testified, RISC's property interests in the receivable were not altered.

B. *Were the payments to Arrow preferential?*

■ The term payments were made to or for the benefit of Arrow, a creditor of RISC. The term payments were made on account of antecedent debts owed by RISC for invoices with dates ranging from April 18, 2000 to May 12, 2000.

RISC was presumed to be insolvent at the time the prepetition payments were made, and Mr. Baron testified about RISC's insolvency. *See* 11 U.S.C. Section 547(f). The Defendants did not introduce any evidence to rebut this presumption. Moreover, counsel to the Trustee represented in an affidavit that at this time it is unlikely that there will be sufficient funds in the estates to provide a dividend to the holders of unsecured, nonpriority claims, which are estimated to be in excess of $6,000,000.00. Accordingly, this Court finds that receipt of the term payments enabled Arrow to receive more than it would if its claim were to be paid in accordance with the provisions of the Bankruptcy Code. Thus, absent any applicable defenses, the Trustee may avoid, as preferential, term payments in the sum of $75,000.

Similarly, the Court finds that, absent any applicable defenses, the Trustee established that the payments related to, but not governed by the terms of, the escrow agreements were preferential. When Arrow shipped goods to Genetics Institute, a debt was created. When RISC paid Arrow it made a transfer of its property to or for the benefit of Arrow which enabled Arrow to receive more than it would under Chapter 7.

Arrow failed to substantiate its arguments that its claim would be separately classified and thus entitled to be paid. This Court finds that its argument lacks both legal and factual merit.

C. *Are RISC's payments to Arrow excepted from avoidance as having been made in the ordinary course of business?*

■ The Court finds that Arrow failed to present any evidence as to the defenses set forth at 11 U.S.C. § 547(c), except with respect to the ordinary course of business defense. Under that subsection, a bankruptcy trustee may not avoid a preference-period transfer

> (2) to the extent that the transfer was
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business ... [between] the debtor and the transferee;
>> (B) made in the ordinary course of business ... of the debtor and the transferee; and
>> (C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2). In *Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Intern., Inc.)*, 132 F.3d 104 (1st Cir.1997), the First Circuit explained the rationale as follows:

> "[T]he general policy of the preference section [is] to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy," the ordinary course exemption promotes the corresponding congressional desire "to leave undisturbed normal financial relations." H.R.Rep. No. 595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329.

The statute itself is uninstructive as to the definition of the term "ordinary course of business." Courts abhor interpretive vacuums, and they have filled this one, articulating several factors that bear upon whether a particular transfer warrants protection under section 547(c)(2). These factors include the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected.

*Id.* at 109. The ordinary course of business exception "benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor, provided that the steps taken are consistent with customary practice among industry participants." *In re Kaypro*, 218 F.3d 1070, 1074 (9th Cir.2000)(citing in *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996)).

The Court finds that Ms. Sullivan's testimony with respect to the average number of days between the invoice dates and payment dates for the so-called SBM division being in the 50s to low 60s is insufficient to protect the term payments from avoidance. The number of days between invoice and payment for the term payments exceeded that range. Moreover, Arrow submitted no evidence of what was customary in the industry.

Although Mr. Barron testified that RISC had been a party to escrow agreements with other distributors, the Court finds that Arrow failed to sustain its burden that the escrow agreements which it entered into with RISC were within the ordinary course of business between the parties. The reason is simple. The escrow agreements simply did not work as intended. The substance of the transactions with Genetics Institute did not involve use of escrows, and thus whether the practice of utilizing escrow arrangements was or was not in the ordinary course of business is immaterial.

## VI. CONCLUSION

In accordance with the foregoing, the Court shall enter an order granting the Trustee's Motion for summary Judgment.